**LeClairRyan**
*A Professional Corporation*
One Riverfront Plaza
1037 Raymond Boulevard, 16th Flr.
Newark, New Jersey 07102
(973) 491-3600
Attorneys for Plaintiff, Days Inns Worldwide, Inc.

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| DAYS INNS WORLDWIDE, INC., a Delaware Corporation, | : |
| Plaintiff, | : |
| v. | : Civil Action No. 14- |
| | : **COMPLAINT** |
| NAIDIP HOSPITALITY-I, LLC, a Florida Limited Liability Company; and JAYESH PATEL, an individual, | : |
| Defendants. | : |
| | : |

Plaintiff Days Inns Worldwide, Inc., by its attorneys, LeClairRyan, complaining of defendants, Naidip Hospitality-I, LLC and Jayesh Patel, says:

### PARTIES, JURISDICTION AND VENUE

1.     Plaintiff Days Inns Worldwide, Inc. ("DIW") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Parsippany, New Jersey.

2.     Defendant Naidip Hospitality-I, LLC ("Naidip"), on information and belief, is a limited liability company organized and existing under the laws of the State of Florida, with its principal place of business at 2055 North Dale Mabry, Tampa, Florida 33607.

3. Defendant Jayesh Patel ("Patel"), on information and belief, is a member of Naidip and a citizen of the State of Florida, having an address at 2055 North Dale Mabry, Tampa, Florida 33607.

4. Upon information and belief, Patel is the only constituent member of Naidip.

5. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 inasmuch as the plaintiff and both defendants are citizens of different states and the amount in controversy in this matter, exclusive of interest and costs, exceeds the sum of $75,000.

6. This Court has personal jurisdiction over Naidip by virtue of, among other things, section 17.6.3 of the August 30, 2005 license agreement by and between Naidip and DIW (the "License Agreement"), described in more detail below, pursuant to which Naidip has consented "to the non-exclusive personal jurisdiction of and venue in the New Jersey state courts situated in Morris County, New Jersey and the United States District Court for the District of New Jersey . . . ."

7. This Court has personal jurisdiction over Patel by virtue of, among other things, the terms of a guaranty (the "Guaranty"), described in more detail below, pursuant to which Patel acknowledged that he was personally bound by section 17 of the License Agreement.

8. Venue is proper in this District pursuant to section 17.6.3 of the License Agreement, inasmuch as that provision contains an express waiver by Naidip of any objection to venue in this District.

2

## ALLEGATIONS COMMON TO ALL COUNTS

### The Agreements Between The Parties

9.      On or about August 30, 2005[1], DIW entered into the License Agreement with Naidip for the operation of a 296-room Days Inn® guest lodging facility located at 2522 North Dale Mabry, Tampa, Florida 33607, Site No. 6875-80385-9 (the "Facility").  A true copy of the License Agreement is attached hereto as Exhibit A.

10.      Pursuant to section 5 of the License Agreement, Naidip was obligated to operate a Days Inn® guest lodging facility for a fifteen-year term.

11.      Pursuant to section 7, section 18.1, and Schedule C of the License Agreement, Naidip was required to make certain periodic payments to DIW for royalties, system assessment fees, taxes, interest, reservation system user fees, and other fees (collectively, "Recurring Fees").

12.      Pursuant to section 7.3 of the License Agreement, Naidip agreed that interest is payable "on any past due amount payable to [DIW] under this [License] Agreement at the rate of 1.5% per month or the maximum rate permitted by applicable law, whichever is less, accruing from the due date until the amount is paid."

13.      Pursuant to section 3.8 of the License Agreement, Naidip was required to disclose, among other things, the amount of gross room revenue earned by Naidip at the Facility for purposes of establishing the amount of royalties and other Recurring Fees due to DIW.

14.      Pursuant to section 3.8 of the License Agreement, Naidip agreed to maintain at the Facility accurate financial information, including books, records, and accounts, relating to the gross room revenue of the Facility and, pursuant to sections 3.8 and 4.8 of the

---

[1] By letter amendment dated October 7, 2008, a true copy of which is attached hereto as Exhibit B, the effective date of the License Agreement was amended from February 14, 2005 to August 30, 2005.

License Agreement, Naidip agreed to allow DIW to examine, audit, and make copies of the entries in these books, records, and accounts.

15.     Pursuant to section 11.2 of the License Agreement, DIW could terminate the License Agreement, with notice to Naidip, for various reasons, including Naidip's (a) failure to pay any amount due DIW under the License Agreement, (b) failure to remedy any other default of its obligations or warranties under the License Agreement within 30 days after receipt of written notice from DIW specifying one or more defaults under the License Agreement, and/or (c) receipt of two or more notices of default under the License Agreement in any one year period, whether or not the defaults were cured.

16.     Pursuant to section 12.1 of the License Agreement, Naidip agreed that, in the event of a termination of the License Agreement pursuant to section 11.2, it would pay liquidated damages to DIW in accordance with a formula specified in the License Agreement.

17.     Section 18.2 of the License Agreement specifically set liquidated damages for the Facility at the lesser of (i) $1,000.00 for each guest room of the Facility Naidip was authorized to operate at the time of termination, or (ii) the total amount of Recurring Fees generated at the Facility during the one year period immediately before the date of termination.

18.     Pursuant to section 17.4 of the License Agreement, Naidip agreed that the non-prevailing party would "pay all costs and expenses, including reasonable attorneys' fees, incurred by the prevailing party to enforce this [License] Agreement or collect amounts owed under this [License] Agreement."

19.     On or about February 14, 2005, DIW entered into a Satellite Connectivity Services Addendum (the "Satellite Addendum") with Naidip.   A true copy of the Satellite Addendum is attached hereto as Exhibit C.

4

20.     Pursuant to section 13(c) of the Satellite Addendum, Naidip agreed that, in the event of a termination of the Satellite Addendum, including by virtue of termination of the License Agreement, it would pay Satellite Addendum Liquidated Damages to DIW in the amount of $1,000.00 within 10 days following the date of termination.

21.     Effective as of the date of the License Agreement, Patel provided DIW with a Guaranty of Naidip's obligations under the License Agreement.  A true copy of the Guaranty is attached hereto as Exhibit D.

22.     Pursuant to the terms of the Guaranty, Patel agreed, among other things, that upon a default under the License Agreement, he would "immediately make each payment and perform or cause [Naidip] to perform, each unpaid or unperformed obligation of [Naidip] under the [License] Agreement."

23.     Pursuant to the terms of the Guaranty, Patel agreed to pay the costs, including reasonable attorneys' fees, incurred by DIW in enforcing its rights or remedies under the Guaranty or the License Agreement.

## The Defendants' Defaults and Termination

24.     Naidip repeatedly failed to meet its financial obligation to DIW, in breach of its obligations under the License Agreement.

25.     By letter dated March 24, 2011, a true copy of which is attached hereto as Exhibit E, DIW advised Naidip that (a) it was in breach of the License Agreement because it owed DIW approximately $155,933.42 in outstanding Recurring Fees, (b) it had 30 days within which to cure this monetary default, and (c) if the default was not cured, then the License Agreement might be subject to termination.

5

26.     By letter dated June 29, 2011, a true copy of which is attached as <u>Exhibit F</u>, DIW terminated the License Agreement effective June 29, 2011 due to Naidip's failure to meet its financial obligations to DIW, and advised Naidip that it was required to pay to DIW liquidated damages for premature termination of the License Agreement, and all outstanding Recurring Fees through the date of termination.

## FIRST COUNT

27.     DIW repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 26 of the Complaint.

28.     Pursuant to sections 3.8 and 4.8 of the License Agreement, Naidip agreed to allow DIW to examine, audit, and make copies of Naidip's financial information, including books, records, and accounts, relating to the gross room revenue earned at the Facility.

29.     The calculation of the monetary amounts sought by DIW in this action is based on the gross room revenue information supplied to DIW by Naidip and, to the extent there has been non-reporting, DIW's estimate as to the gross room revenue earned by Naidip.

30.     The accuracy of this estimate cannot be ascertained without an accounting of the receipts and disbursements, profit and loss statements, and other financial materials, statements and books from Naidip.

**WHEREFORE**, DIW demands judgment ordering that Naidip account to DIW for any and all revenue derived as a result of marketing, promoting, or selling guest lodging services at the Facility from the inception through the date of termination of the License Agreement.

## SECOND COUNT

31.     DIW repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 30 of the Complaint.

32.     By letter dated June 29, 2011, DIW terminated the License Agreement effective June 29, 2011 due to Naidip's failure to meet its financial obligations to DIW.

33.     Section 12.1 of the License Agreement provides that, in the event of termination of the License Agreement due to action of the Licensee, Naidip shall pay liquidated damages to DIW within 30 days of termination.

34.     Section 13(c) of the Satellite Addendum provides that, in the event of a termination of the Satellite Addendum, including by virtue of termination of the License Agreement, Naidip shall pay Satellite Addendum Liquidated Damages to DIW in the amount of $1,000.00 within 10 days following the date of termination.

35.     As a result of the termination of the License Agreement, Naidip is obligated to pay DIW liquidated damages in the amount of $95,649.11, as calculated pursuant to sections 12.1 and 18.2 of the License Agreement and section 13(c) of the Satellite Addendum.

36.     Notwithstanding DIW's demand for payment, Naidip has failed to pay DIW the liquidated damages as required in sections 12.1 and 18.2 of the License Agreement and section 13(c) of the Satellite Addendum.

37.     DIW has been damaged by Naidip's failure to pay liquidated damages.

**WHEREFORE**, DIW demands judgment against Naidip for liquidated damages in the amount of $95,649.11, together with interest, attorneys' fees, and costs of suit.

## THIRD COUNT

38.    DIW repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 37 of the Complaint.

39.    By virtue of the premature termination of the License Agreement, DIW sustained a loss of future revenue over the remainder of the fifteen-year term of the License Agreement.

40.    If the Court determines that Naidip is not liable to pay DIW liquidated damages as required by sections 12.1 and 18.2 of the License Agreement and section 13(c) of the Satellite Addendum then, in the alternative, Naidip is liable to DIW for actual damages for the premature termination of the License Agreement and Satellite Addendum.

41.    DIW has been damaged by Naidip's breach of its obligation to operate a Days Inn® guest lodging facility for the remaining term of the License Agreement.

**WHEREFORE**, DIW demands judgment against Naidip for actual damages in an amount to be determined at trial, together with interest, attorneys' fees, and costs of suit.

## FOURTH COUNT

42.    DIW repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 41 of the Complaint.

43.    Pursuant to section 7, section 18.1, and Schedule C of the License Agreement, Naidip was obligated to remit Recurring Fees to DIW.

44.    Despite its obligation to do so, Naidip failed to remit certain of the Recurring Fees due and owing under the License Agreement in the current amount of $255,942.34.

45.   Naidip's failure to remit the agreed Recurring Fees constitutes a breach of the License Agreement and has damaged DIW.

**WHEREFORE**, DIW demands judgment against Naidip for the Recurring Fees due and owing under the License Agreement, in the current amount of $255,942.34, together with interest, attorneys' fees, and costs of suit.

## FIFTH COUNT

46.   DIW repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 45 of the Complaint.

47.   At the time of the termination of the License Agreement, Naidip was obligated to pay DIW Recurring Fees.

48.   Despite its obligation to do so, Naidip failed to pay certain of the Recurring Fees due and owing under the License Agreement in the current amount of $255,942.34.

49.   Naidip's failure to compensate DIW constitutes unjust enrichment and has damaged DIW.

**WHEREFORE**, DIW demands judgment against Naidip for the Recurring Fees due and owing under the License Agreement, in the current amount of $255,942.34, together with interest, attorneys' fees, and costs of suit.

## SIXTH COUNT

50.   DIW repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 49 of the Complaint.

9

51.     Pursuant to the terms of the Guaranty, Patel agreed, among other things, that upon a default under the License Agreement, he would immediately make each payment and perform each obligation required of Naidip under the License Agreement.

52.     Despite his obligation to do so, Patel has failed to make any payments or perform or cause Naidip to perform each obligation required under the License Agreement.

53.     Pursuant to the Guaranty, Patel is liable to DIW for Naidip's liquidated damages in the amount of $95,649.11, or actual damages in an amount to be determined at trial, and Naidip's Recurring Fees due and owing under the License Agreement, in the current amount of $255,942.34.

**WHEREFORE**, DIW demands judgment against Patel for all liquidated damages, or actual damages, and Recurring Fees due and owing under the License Agreement, together with interest, attorneys' fees, and costs of suit.

**LeClairRyan**
Attorneys for Plaintiff,
Days Inns Worldwide, Inc.

By: _____
Bryan P. Couch

Dated:   1/24/14

10

## CERTIFICATION PURSUANT TO L. CIV. R. 11.2

      I certify that, to the best of my knowledge, this matter is not the subject of any other action pending in any court or of any pending arbitration or administrative proceeding.

**LeClairRyan**
Attorneys for Plaintiff,
Days Inns Worldwide, Inc.

By: _____
      Bryan P. Couch

Dated: 1/24/14

# EXHIBIT A

Location: Tampa, FL
Entity No: 83605
Unit No.: 6875

# DAYS INNS WORLDWIDE, INC.
# LICENSE AGREEMENT

THIS LICENSE AGREEMENT ("Agreement"), dated *February 14*, 200*5*, is between DAYS INNS WORLDWIDE, INC., a Delaware corporation ("we", "our", or "us"), and **NAIDIP HOSPITALITY-I, LLC**, a Florida limited liability company ("you"). The definitions of capitalized terms are found in Appendix A. In consideration of the following mutual promises, the parties agree as follows:

This transaction involves the transfer of an existing Chain Facility at the Location first granted to **Royal Palm Tampa, L.L.C.** a Florida limited liability company, ("Prior Licensee"), in a License Agreement with us dated **December 19, 2000** (the "Prior Agreement"). ~~You assume and obligate yourself to perform any and all of the obligations (financial and otherwise) of the Prior Licensee under the Prior Agreement that is not paid or performed as of the date of this Agreement, including without limitation, the obligation to pay any unpaid Royalties, System Assessment Fees, Basic Service Charges, or other amounts due us and to correct any uncured defaults other than as expressly superseded by this Agreement.~~ You acknowledge that you must pay a retraining fee to us for updating the Facility's property management information system.

**1. License.** We have the exclusive right to license and franchise to you the distinctive "Days Inn" System for providing transient guest lodging services. We grant to you and you accept the License, effective and commencing on the Opening Date and ending on the earliest to occur of the Term's expiration or a Termination. You will call the Facility a "**Days Inn.**" You may adopt additional or secondary designations for the Facility with our prior written consent, which we may withhold, condition, or withdraw on written notice in our sole discretion. You shall not affiliate or identify the Facility with another franchise system, reservation system, brand, cooperative or registered mark during the Term.

**2. Days Inns Licensee Advisory Association.** You will be eligible to participate in the Days Inn Licensee Advisory Association, a Delaware corporation that is the organization of Days Inn System licensees, in accordance with the Bylaws and Certificate of Incorporation of the Association, as amended, so long as you are not in default under this Agreement.

**3. Your Improvement and Operating Obligations.** Your obligations to improve, operate and maintain the Facility are:

**3.1 Improvements.** You must select and acquire the Location and acquire, equip and supply the Facility in accordance with System Standards for entering conversion facilities. You must begin improvement of the Facility no later than thirty (30) days after the Effective Date. The Facility must score 400 points within ninety (90) days after the Effective Date and 425 points (or equivalent scores under a successor quality assurance scoring system we employ), within nine months after the Effective Date. All improvements will comply with System Standards, any Approved Plans,

1

Schedule B and any Punch List attached to this Agreement. Your general contractor or you must carry the insurance required under this Agreement during renovation. If you do not commence or complete the improvement of the Facility by the dates specified in this Section 3.1, or the Facility does not meet the post-transfer quality assurance inspection standard, or complete the post-transfer improvements specified in the Punch List after the Effective Date, then we may, in our sole discretion, terminate this Agreement by giving written notice to you. Time is of the essence for the Improvement Obligation. We may, however, in our sole discretion, grant one or more extensions of time to perform any phase of the Improvement Obligation. The grant of an extension will not waive any other default existing at the time the extension is granted.

3.2 **Improvement Plans.** You will create plans and specifications for the work described in Section 3.1 (based upon the System Standards and this Agreement) if we so request and submit them for our approval before starting improvement of the Location. We will not unreasonably withhold or delay our approval, which is intended only to test compliance with System Standards, and not to detect errors or omissions in the work of your architects, engineers, contractors or the like. Our review does not cover technical, architectural or engineering factors, or compliance with federal, state or local laws, regulations or code requirements. We will not be liable to your lenders, contractors, employees, guests, others, or you on account of our review or approval of your plans, drawings or specifications, or our inspection of the Facility before, during or after renovation or construction. Any material variation from the Approved Plans requires our prior written approval. You will promptly provide us with copies of permits, job progress reports, and other information as we may reasonably request. We may inspect the work while in progress without prior notice.

3.3 **Opening.** You may continue to identify the Facility as part of the System prior to completing the Improvement Obligation.

3.4 **Operation.** You will operate and maintain the Facility continuously after the Opening Date on a year-round basis as required by System Standards and offer transient guest lodging and other related services of the Facility (including those specified on Schedule B) to the public in compliance with the law and System Standards. You will keep the Facility in a clean, neat, and sanitary condition. You will clean, repair, replace, renovate, refurbish, paint, and redecorate the Facility and its FF&E as and when needed to comply with System Standards. The Facility will accept payment from guests by all credit and debit cards we designate in the System Standards Manual. You may add to or discontinue the amenities, services and facilities described in Schedule B, or lease or subcontract any service or portion of the Facility, only with our prior written consent which we will not unreasonably withhold or delay. Your front desk operation, telephone system, parking lot, swimming pool and other guest service facilities may not be shared with or used by guests of another lodging or housing facility.

3.5 **Training.** You, or a person with executive authority if you are an entity, and the Facility's general manager (or other representative who exercises day to day operational authority) will attend the training programs described in Section 4.1 we designate as mandatory for licensees or general managers, respectively. You will train or cause the training of all Facility personnel as and when required by System Standards and this Agreement. You will pay for all travel, lodging,

DAYEXCi
166950 8/04

meals and compensation expenses of the people you send for training programs, the cost of training materials and other reasonable charges we may impose for training under Section 4.1. You will direct the Facility staff to attend on-site opening training in connection with the opening of the Facility and reimburse us for our expenses for the training as discussed in Section 4.1.3.

3.6  **Marketing.**  You will participate in System marketing programs, including the Directory and the Reservation System. You will obtain and maintain the computer and communications service and equipment we specify to participate in the Reservation System. You will comply with our rules and standards for participation, and will honor reservations and commitments to guests and travel industry participants. You authorize us to offer and sell reservations for rooms and services at the Facility according to the rules of participation and System Standards. You may implement, at your option and expense, your own local advertising. Your advertising materials must use the Marks correctly, and must comply with System Standards or be approved in writing by us prior to publication. You will stop using any non-conforming, out-dated or misleading advertising materials if we so request.

3.6.1  You may participate in any regional marketing, training or management alliance or cooperative of Chain licensees formed to serve the Chain Facilities in your area. We may assist the cooperative collect contributions. You may be excluded from cooperative programs and benefits if you don't participate in all cooperative programs according to their terms, including making payments and contributions when due.

3.6.2  The Facility must participate in our Chain-wide Internet marketing activities like other marketing programs. You will discontinue any Internet marketing that conflicts, in our reasonable discretion, with Chain-wide Internet marketing activities. You must honor the terms of any participation agreement you sign for Internet marketing. You shall pay when due any fees, commissions, charges and reimbursements relating to Internet marketing activities (i) in which you agree to participate, or (ii) that we designate as mandatory on a Chain-wide basis, provided that the activities carry aggregate fees per transaction of not more than the sum of the full agent commission specified on Schedule C for sales agents, plus 10% of the Chain's reported average daily rate for the preceding calendar year. We may suspend the Facility's participation in Internet marketing activity if you default under this Agreement.

3.7  **Governmental Matters.**  You will obtain as and when needed all governmental permits, licenses and consents required by law to construct, acquire, renovate, operate and maintain the Facility and to offer all services you advertise or promote. You will pay when due or properly contest all federal, state and local payroll, withholding, unemployment, beverage, permit, license, property, ad valorem and other taxes, assessments, fees, charges, penalties and interest, and will file when due all governmental returns, notices and other filings. You will comply with all applicable federal, state and local laws, regulations and orders applicable to you and/or the Facility, including those combating terrorism such as the USA Patriot Act and Executive Order 13224.

3.8  **Financial Books & Records; Audits.**

3.8.1  The Facility's transactions must be timely and accurately recorded in accounting books and

3

records prepared on an accrual basis compliant with generally accepted accounting principles of the United States ("GAAP") and consistent with the most recent edition of the Uniform System of Accounts for the Lodging Industry published by the American Hotel & Motel Association, as modified by this Agreement and System Standards. You acknowledge that your accurate accounting for and reporting of Gross Room Revenues is a material obligation you accept under this Agreement.

3.8.2 We may notify you of a date on which we propose to audit the Facility's books and records. You will be deemed to confirm our proposed date unless you follow the instructions with the audit notice for changing the date. You need to inform us where the books and records will be produced. You need to produce for our auditors at the confirmed time and place for the audit the books, records, tax returns and financial statements relating to the Facility for the applicable accounting periods we require under this Agreement and System Standards. If our auditors must return to your location after the first date we confirm for the audit because you violate this Section 3.8.2 or refuse to cooperate with the reasonable requests of our auditors, you must pay us the Audit Fee under Section 4.8 when invoiced. We may also perform an audit of the Facility's books and records without advance notice. Your staff must cooperate with and assist our auditors to perform any audit we conduct.

3.8.3 We will notify you in writing if you default under this Agreement because (i) you do not cure a violation of Section 3.8.2 within 30 days after the date of the initial audit, (ii) you cancel 2 or more previously scheduled audits, (iii) you refuse to admit our auditors for an audit during normal business hours at the place where you maintain the Facility's books and records, or refuse to produce the books and records required under this Agreement and System Standards for the applicable accounting periods; (iv) our audit determines that the books and records you produced are incomplete or show evidence of tampering or violation of generally accepted internal control procedures, or (v) our audit determines that that you have reported to us less than 97% of the Facility's Gross Room Revenues for any fiscal year preceding the audit. Our notice of default may include, in our sole discretion and as part of your performance needed to cure the default under this Section 3.8, an "Accounting Procedure Notice." You must also pay any deficiency in Recurring Fees or other charges we identify and invoice as a result of the audit. The Accounting Procedure Notice requires that you obtain and deliver to us, within 90 days after the end of each of your next three fiscal years ending after the Accounting Procedure Notice, an audit opinion signed by an independent certified public accountant who is a member of the American Institute of Certified Public Accountants addressed to us that the Facility's Gross Room Revenues you reported to us during the fiscal year fairly present the Gross Room Revenues of the Facility computed in accordance with this Agreement for the fiscal year.

3.9 **Inspections.** You acknowledge that the Facility's participation in our quality assurance inspection program (including unannounced inspections) is a material obligation you accept under this Agreement. You will permit our representatives to perform quality assurance inspections of the Facility at any time with or without advance notice. The inspections will commence during normal business hours although we may observe Facility operation at any time. You and the Facility staff will cooperate with the inspector performing the inspection. If the Facility fails an inspection, you refuse to cooperate with our inspector, or you refuse to comply with our published inspection System Standards, then you will pay us when invoiced for any

4

reinspection fee specified in System Standards Manuals (which is $750 on the Effective Date and will not exceed $2,500) plus the reasonable travel, lodging and meal costs our inspector incurs for a reinspection. We may also conduct paper and electronic customer satisfaction surveys of your guests and include the results in your final quality assurance score. We may publish and disclose the results of quality assurance inspections and guest surveys.

3.10 **Insurance.** You will obtain and maintain during the Term of this Agreement the insurance coverage required under the System Standards Manual from insurers meeting the standards established in the Manual. Unless we instruct you otherwise, your liability insurance policies will name Days Inns Worldwide, Inc., Cendant Hotel Group, Inc. and Cendant Corporation, their successors and assigns as additional insureds.

3.11 **Conferences.** You (or your representative with executive authority if you are an entity) will attend each annual Chain conference and pay the Conference Fee we set for the Chain licensees, if and when we determine to hold an annual Chain conference. Mandatory recurrent training for licensees and managers described in Section 4.1.3 may be held at a conference. The Fee will be the same for all Chain Facilities that we license in the United States. You will receive reasonable notice of a Chain conference.

3.12 **Purchasing.** You will purchase or obtain certain items we designate as proprietary or that bear Marks, such as signage, only from suppliers we approve. You may purchase any other items for the Facility from any competent source you select, so long as the items meet or exceed System Standards.

3.13 **Good Will.** You will use reasonable efforts to protect, maintain and promote the name "Days Inn" and its distinguishing characteristics, and the other Marks. You will not permit or allow your officers, directors, principals, employees, representatives, or guests of the Facility to engage in conduct which is unlawful or damaging to the good will or public image of the Chain or System. You will participate in Chain-wide guest service and satisfaction guaranty programs we require in good faith for all Chain Facilities. You will follow System Standards for identification of the Facility and for you to avoid confusion on the part of guests, creditors, lenders, investors and the public as to your ownership and operation of the Facility, and the identity of your owners.

3.14 **Facility Modifications.** You may materially modify, diminish or expand the Facility (or change its interior design, layout, FF&E, or facilities) only after you receive our prior written consent, which we will not unreasonably withhold or delay. You will pay our Rooms Addition Fee then in effect for each guest room you add to the Facility. If we so request, you will obtain our prior written approval of the plans and specifications for any material modification, which we will not unreasonably withhold or delay. You will not open to the public any material modification until we inspect it for compliance with the Approved Plans and System Standards.

3.15 **Courtesy Lodging.** You will provide lodging at the "Employee Rate" established in the System Standards Manual from time to time (but only to the extent that adequate room vacancies exist) to our representatives traveling on business, but not more than three standard guest rooms at the same time.

3.16 **Minor Renovations.** Beginning three years after the Opening Date, we may issue a "Minor Renovation Notice" to you that will specify reasonable Facility upgrading and renovation requirements (a "Minor Renovation") to be commenced no sooner than 60 days after the notice is issued; having an aggregate cost for labor, FF&E and materials estimated by us to be not more than the Minor Renovation Ceiling Amount. You will perform the Minor Renovations as and when the Minor Renovation Notice requires. We will not issue a Minor Renovation Notice within three years after the date of a prior Minor Renovation Notice, or if the three most recent quality assurance inspection scores of the Facility averaged at least 425 points and the most recent quality assurance inspection score for the Facility was at least 400 points (or equivalent scores under a successor quality assurance scoring system we employ), when the Facility is otherwise eligible for a Minor Renovation.

4. **Our Operating and Service Obligations.** We will provide you with the following services and assistance:

4.1 **Training.** We will offer (directly or indirectly by subcontracting with an affiliate or a third party) general manager and owner orientation training, on-site opening training, remedial training and supplemental training.

4.1.1 **General Manager Orientation Training.** We will offer at a location in the United States we designate a general manager orientation training program. The program will not exceed two weeks in duration and will cover such topics as System Standards, services available from us, and operating a Chain Facility. Your initial general manager (or other representative who exercises day to day operational authority) for the Facility must complete this program to our satisfaction no later than 90 days after he/she assumes the position or 90 days after the Opening Date, whichever occurs first. If we do not offer a place in general manager orientation within that time frame, your general manager must attend the next program held at which we offer a place. Any replacement general manager must complete general manager orientation within 90 days after he/she assumes the position or the next program available, whichever comes later. Your general manager for the Facility must complete general manager orientation even if you employ managers at other Chain Facilities who have already received this training. We charge you tuition of $995 for your first general manager if you open the Facility with our approval and your general manager completes general manager orientation within the time period established under this Agreement. You must pay the tuition then in effect as disclosed in our latest Uniform Franchise Offering Circular ("UFOC"), but not more than $3,000, if you do not meet these deadlines. For any supplemental or replacement general manager, you must pay the tuition in effect for the program when your manager attends the program. You must also pay for your manager's travel, lodging, meals, incidental expenses, compensation and benefits.

4.1.2 **Owner Orientation Training.** We will offer an owner orientation training program to familiarize you with the System, the Chain, and our services. If this is your first System license, you (or a person with executive authority if you are an entity) must attend owner orientation preferably before, but not later than 60 days prior to the Opening Date. If we do not offer owner orientation training within this time period, you must attend the next program offered. Financial institutions and real estate mortgage investment conduits are exempt from the obligation to attend owner orientation, but may choose to do so at their option. Owner orientation will be no longer

6

than five days. We charge you tuition of $825 if you open the Facility with our approval and attend owner orientation within the time periods established under this Agreement. If you do not open the Facility and attend orientation by such deadlines, you must pay the tuition then in effect for this program as disclosed in our latest UFOC, but not more than $3,000. You must also pay your travel, lodging, meal and incidental expenses.

4.1.3 **On-Site Opening Training.** We will provide at the Facility or another agreed location, and your staff must attend, on-site opening training (at our discretion as to length and scheduling) to assist you in opening the Facility. There is currently no charge for the initial training program. You will pay the cost of any site used if the Facility is not available and the rent for any equipment we need. You must provide lodging for our trainers at your expense. You must also pay, at our request, the reasonable travel, meal and out-of-pocket expenses incurred by our trainers for on-site opening training.

4.1.4 **DaySkills Certification.** Each general manager must successfully complete the DaySkills (or successor) certification program on an annual basis. This program is accessible on-line via the System Intranet. Licensees also must complete DaySkills before the Opening Date.

4.1.5 **Remedial Training.** We may require you, your general manager and/or your staff to participate in on-site remedial training if the Facility fails multiple quality assurance inspections and/or experiences significant complaints to our guest services department, as a condition to avoiding termination or to resumption of reservation service. You must pay the tuition in effect for this program when it is offered to you, and you must provide lodging for our trainers. As of March 31, 2003, tuition for remedial on-site training is $450 per day, which must be paid before the training commences. We may increase the tuition charge in the future. The length of the remedial training could be up to five days, depending on the severity of the quality assurance and/or customer service issues.

4.1.6 **Supplemental Training.** We may offer other mandatory or optional training programs for reasonable tuition or without charge. This training could be held in our U.S. training center or other locations. You will pay for your representative's travel, lodging, meals, incidental expenses, compensation and benefits and any tuition charge we establish for this training. This training may be held in conjunction with a Chain Lodging conference. We may offer, rent or sell to you video tapes, computer discs or other on-site training aids and materials, or require you to buy them at reasonable prices. We may also offer Internet-based training via the Chain's intranet website.

4.1.7 **Cancellation Fees.** We will charge you a cancellation fee of 50% of the tuition for a program if you cancel your participation less than 15 days before it is scheduled to be held. If you fail to attend a training program as scheduled without notifying us in advance, your cancellation fee will be 100% of the tuition for the program. These fees are non-refundable and you will also be charged the full tuition in effect for the program when you reschedule your training.

4.2 **Reservation System.** We will operate and maintain (directly or by subcontracting with an affiliate or one or more third parties) a computerized Reservation System or such technological substitute(s) as we determine, in our discretion. We will use the Basic Service Charge for the acquisition, development, support, equipping, maintenance, improvement and operation of the

7

Reservation System. We will provide software maintenance for the software we license to you to connect to the Reservation System if you are up to date in your payment of Recurring Fees and all other fees you must pay under any other agreement with us or our affiliate. The Facility will participate in the Reservation System, commencing with the Opening Date for the balance of the Term. We have the right to provide reservation services to lodging facilities other than Chain Facilities or to other parties. We will not offer callers to our general consumer toll free reservation telephone number in the United States the opportunity to make reservations for other lodging chains.

### 4.3 Marketing.

4.3.1 We will promote public awareness and usage of Chain Facilities by implementing advertising, promotion, publicity, market research and other marketing programs, training programs and related activities, and the production and distribution of Chain publications and directories of hotels. We will determine in our discretion: (i) The nature and type of media placement; (ii) The allocation (if any) among international, national, regional and local markets; and (iii) The nature and type of advertising copy, other materials and programs. We or an affiliate may be reimbursed for the reasonable direct and indirect costs, overhead or other expenses of providing marketing services. We are not obligated to supplement or advance funds available from System licensees to pay for marketing activities. We do not promise that the Facility or you will benefit directly or proportionately from marketing activities.

4.3.2 We may, at our discretion, implement special international, national, regional or local promotional programs (which may or may not include the Facility) and may make available to you (to use at your option) media advertising copy and other marketing materials for prices which reasonably cover the materials' direct and indirect costs.

4.3.3 We will publish the Chain Directory. We will include the Facility in the Chain Directory after it opens if you submit the information we request on time, and you are not in default under this Agreement at the time we must arrange for publication. We will supply Directories to you for display at locations specified in the System Standards Manual or policy statements. We may assess you a reasonable charge for the direct and indirect expenses (including overhead) of producing and delivering the Directories.

4.4 **Purchasing.** We may offer optional assistance to you with purchasing items used at or in the Facility. Our affiliates may offer this service on our behalf. We may restrict the vendors authorized to sell proprietary or Mark-bearing items in order to control quality, provide for consistent service or obtain volume discounts. We will maintain and provide to you lists of suppliers approved to furnish Mark-bearing items, or whose products conform to System Standards.

4.5 **The System.** We will control and establish requirements for all aspects of the System. We may, in our discretion, change, delete from or add to the System, including any of the Marks or System Standards, in response to changing market conditions. We may, in our discretion, permit deviations from System Standards, based on local conditions and our assessment of the circumstances.

4.6 **Consultations and Standards Compliance.** We will assist you to understand your

8

obligations under System Standards by telephone, mail, during quality assurance inspections, through the System Standards Manual, at training sessions and during conferences and meetings we conduct. We will provide telephone and mail consultation on Facility operation and marketing through our representatives. We will offer you access to any Internet website we may maintain to provide Chain licensees with information and services, subject to any rules, policies and procedures we establish for its use and access and to this Agreement. We may limit or deny access to any such website while you are in default under this Agreement.

4.7  **System Standards Manual and Other Publications.**  We will specify System Standards in the System Standards Manual, policy statements or other publications. We will lend you one copy of the System Standards Manual promptly after we sign this Agreement. We will send you any System Standards Manual revisions and/or supplements as and when issued. We will send you all other publications for Chain licensees and all separate policy statements in effect from time to time.

4.8  **Inspections and Audits.**  We have the unlimited right to conduct unannounced quality assurance inspections of the Facility and its operations, records and Mark usage to test the Facility's compliance with System Standards and this Agreement, and the audits described in Section 3.8. We have the unlimited right to reinspect if the Facility does not achieve the score required on an inspection. We may impose a reinspection fee and will charge you for our costs as provided in Section 3.9. You will pay us an "Audit Fee" of $300.00 when we invoice you for an Audit Fee under Section 3.8. We may increase the Audit Fee on a Chain-wide basis to cover any increases in our audit costs to not more than $500.00, effective any time after December 31, 2005. Our inspections are solely for the purposes of checking compliance with System Standards.

**5.  Term.**  The Term begins on the Effective Date and expires at the end of the fifteenth License Year. Some of your duties and obligations will survive termination or expiration of this Agreement. NEITHER PARTY HAS RENEWAL RIGHTS OR OPTIONS.

**6.  Initial Fees.**

6.1  **Application and Initial Fees.**  We should receive from you a non-refundable Application Fee of $1,000.00. You will pay us a non-refundable Initial Fee in the amount of **$ 20,000.00** when you sign this Agreement, which is fully earned when we sign this Agreement, as the Relicense Fee established under the Prior Agreement.

**7.  Recurring Fees, Taxes and Interest.**

7.1  You will pay us certain "Recurring Fees" in U.S. dollars (or such other currency as we may direct if the Facility is outside the United States) ten days after the month in which they accrue, without billing or demand. Recurring Fees include the following:

7.1.1  A "Royalty" equal to five percent (5.0%) of Gross Room Revenues of the Facility accruing during the calendar month, accrues from the earlier of the Opening Date or the date you identify the Facility as a Chain Facility or operate it under a Mark until the end of the Term.

7.1.2  "System Assessment Fees," including a "Basic Service Charge" as set forth in Schedule C for

9

advertising, marketing, training, the Reservation System and other related services and programs, and the specific additional charges and fees referred to in Schedule C or Section 4.2 of this Agreement as "Additional Charges," accrues from the Opening Date until the end of the Term, including during reservation suspension periods. We will allocate at least 39% of the Basic Service Charge to advertising, marketing and related services and programs. We reserve the right to increase or modify the System Assessment Fees for all Chain Facilities, and to add other fees and charges for new services, at our sole discretion as to amount or formula, from time to time, but with at least 30 days prior written notice and after consultation with the Days Inns Franchisee Advisory Association Board of Directors, by substituting a new Schedule C or otherwise, to reflect changes in the fully allocated costs of providing marketing and reservation services, and to add, drop or modify the types of services we offer. You will also pay or reimburse us for travel and other agent commissions paid for certain reservations at the Facility and a "GDS Fee" levied to pay for reservations for the Facility originated or processed through the Global Distribution System, the Internet and other reservation systems and networks. We may charge a reasonable service fee for this service. We, or our affiliates, may charge Facilities using the System outside the United States using a different formula.

7.2  You will pay to us "Taxes" equal to any federal, state or local sales, gross receipts, use, value added, excise or similar taxes assessed against us on the Recurring Fees by the jurisdictions where the Facility is located, but not including any income tax, franchise or other tax for the privilege of doing business by us in your State. You will pay Taxes to us when due.

7.3  "Interest" is payable when you receive our invoice on any past due amount payable to us under this Agreement at the rate of 1.5% per month or the maximum rate permitted by applicable law, whichever is less, accruing from the due date until the amount is paid.

7.4  If a transfer occurs, your transferee or you will pay us our then current Application Fee and a "Relicense Fee" equal to the Initial Fee we would then charge a new licensee for the Facility.

## 8. Indemnifications.

8.1  Independent of your obligation to procure and maintain insurance, you will indemnify, defend and hold the Indemnitees harmless, to the fullest extent permitted by law, from and against all Losses and Expenses, incurred by any Indemnitee for any investigation, claim, action, suit, demand, administrative or alternative dispute resolution proceeding, relating to or arising out of any transaction, occurrence or service at, or involving the operation of, the Facility, any payment you make or fail to make to us, any breach or violation of any contract or any law, regulation or ruling by, or any act, error or omission (active or passive) of, you, any party associated or affiliated with you or any of the owners, officers, directors, employees, agents or contractors of you or your affiliates, including when you are alleged or held to be the actual, apparent or ostensible agent of the Indemnitee, or the active or passive negligence of any Indemnitee is alleged or proven. You have no obligation to indemnify an Indemnitee for damages to compensate for property damage or personal injury if a court of competent jurisdiction makes a final decision not subject to further appeal that the Indemnitee engaged in willful misconduct or intentionally caused such property damage or bodily injury. This exclusion from the obligation to indemnify shall not, however, apply if the property damage or bodily injury resulted from the use of reasonable force by the Indemnitee

10

to protect persons or property.

8.2 You will respond promptly to any matter described in the preceding paragraph, and defend the Indemnitee. You will reimburse the Indemnitee for all costs of defending the matter, including reasonable attorneys' fees, incurred by the Indemnitee if your insurer or you do not assume defense of the Indemnitee promptly when requested, or separate counsel is appropriate, in our discretion, because of actual or potential conflicts of interest. We must approve any resolution or course of action in a matter that could directly or indirectly have any adverse effect on us or the Chain, or could serve as a precedent for other matters.

8.3 We will indemnify, defend and hold you harmless, to the fullest extent permitted by law, from and against all Losses and Expenses incurred by you in any action or claim arising from your proper use of the System alleging that your use of the System and any property we license to you is an infringement of a third party's rights to any trade secret, patent, copyright, trademark, service mark or trade name. You will promptly notify us in writing when you become aware of any alleged infringement or an action is filed against you. You will cooperate with our defense and resolution of the claim. We may resolve the matter by obtaining a license of the property for you at our expense, or by requiring that you discontinue using the infringing property or modify your use to avoid infringing the rights of others.

## 9. Your Assignments, Transfers and Conveyances.

9.1 **Transfer of the Facility.** This Agreement is personal to you (and your owners if you are an entity). We are relying on your experience, skill and financial resources (and that of your owners and the guarantors, if any) to sign this Agreement with you. You may finance the Facility and grant a lien, security interest or encumbrance on it without notice to us or our consent. If a Transfer is to occur, the transferee or you must comply with Section 9.3. Your License is subject to termination when the Transfer occurs. The License is not transferable to your transferee, who has no right or authorization to use the System and the Marks when you transfer ownership or possession of the Facility. The transferee may not operate the Facility under the System, and you are responsible for performing the post-termination obligations in Section 13. You and your owners may, only with our prior written consent and after you comply with Sections 9.3 and 9.6, assign, pledge, transfer, delegate or grant a security interest in all or any of your rights, benefits and obligations under this Agreement, as security or otherwise. Transactions involving Equity Interests that are not Equity Transfers do not require our consent and are not Transfers.

9.2 **Public Offerings and Registered Securities.** You may engage in the first registered public offering of your Equity Interests only after you pay us a public offering fee equal to $15,000. Your Equity Interests (or those of a person, parent, subsidiary, sibling or affiliate entity, directly or indirectly effectively controlling you), are freely transferable without the application of this Section if they are, on the Effective Date, or after the public offering fee is paid, they become, registered under the federal Securities Act of 1933, as amended, or a class of securities registered under the Securities Exchange Act of 1934, as amended, or listed for trading on a national securities exchange or the automated quotation system of the National Association of Securities Dealers, Inc. (or any successor system), provided that any tender offer for at least a majority of your Equity Interests will be an Equity Transfer subject to Section 9.1.

DAYEXC1
166050 8/04

**9.3  Conditions.**  We may, to the extent permitted by applicable law, condition and withhold our consent to a Transfer when required under this Section 9 until the transferee and you meet certain conditions. If a Transfer is to occur, the transferee (or you, if an Equity Transfer is involved) must first complete and submit our Application, qualify to be a licensee in our sole discretion, given the circumstances of the proposed Transfer, provide the same supporting documents as a new license applicant, pay the Application and Relicense Fees then in effect, sign the form of License Agreement we then offer in conversion transactions and agree to renovate the Facility as if it were an existing facility converting to the System, as we reasonably determine. We will provide a Punch List of improvements we will require after the transferee's Application is submitted to us. We may require structural changes to the Facility if it no longer meets System Standards for entering conversion facilities, or in the alternative, condition our approval of the Transfer on one or more of the following: limit the transferee's term to the balance of your Term, add a right to terminate without cause exercisable by either party after a period of time has elapsed, or allow you to terminate the License when you sell the Facility and pay us Liquidated Damages under Section 12.1 at the same rate as you would pay if the termination occurred before the Opening Date. Such payment would be due and payable when you transfer possession of the Facility. We must also receive general releases from you and each of your owners, and payment of all amounts then owed to us and our affiliates by you, your owners, your affiliates, the transferee, its owners and affiliates, under this Agreement or otherwise. Our consent to the transaction will not be effective until these conditions are satisfied.

**9.4  Permitted Transferee Transactions.**  You may transfer an Equity Interest or effect an Equity Transfer to a Permitted Transferee without obtaining our consent, renovating the Facility or paying a Relicense Fee or Application Fee. No Transfer will be deemed to occur. You also must not be in default and you must comply with the application and notice procedures specified in Sections 9.3 and 9.6. Each Permitted Transferee must first agree in writing to be bound by this Agreement, or at our option, execute the License Agreement form then offered prospective licensees. No transfer to a Permitted Transferee shall release a living transferor from liability under this Agreement or any guarantor under any Guaranty of this Agreement. You must comply with this Section if you transfer the Facility to a Permitted Transferee. A transfer resulting from a death may occur even if you are in default under this Agreement.

**9.5  Attempted Transfers.**  Any transaction requiring our consent under this Section 9 in which our consent is not first obtained shall be void, as between you and us. You will continue to be liable for payment and performance of your obligations under this Agreement until we terminate this Agreement, all your financial obligations to us are paid and all System identification is removed from the Facility.

**9.6  Notice of Transfers.**  You will give us at least 30 days prior written notice of any proposed Transfer or Permitted Transferee transaction. You will notify us when you sign a contract to Transfer the Facility and 10 days before you intend to close on the transfer of the Facility. We will respond to all requests for our consent and notices of Permitted Transferee transactions within a reasonable time not to exceed 30 days. You will notify us in writing within 30 days after a change in ownership of 25% or more of your Equity Interests that are not publicly held or that is not an Equity Transfer, or a change in the ownership of the Facility if you are not its owner. You will

DAYEXCI
166050 8/04

provide us with lists of the names, addresses, and ownership percentages of your owner(s) at our request.

**10. Our Assignments.** We may assign, delegate or subcontract all or any part of our rights and duties under this Agreement, including by operation of law, without notice and without your consent. We will have no obligations to you after you are notified that our transferee has assumed our obligations under this Agreement except those that arose before we assign this Agreement.

## 11. Default and Termination.

11.1 **Default.** In addition to the matters identified in Sections 3.1 and 3.8, you will be in default under this Agreement if (a) you do not pay us when a payment is due under this Agreement or any other instrument, debt, agreement or account with us related to the Facility, (b) you do not perform any of your other obligations when this Agreement and the System Standards Manual require, or (c) if you otherwise breach this Agreement. If your default is not cured within ten days after you receive written notice from us that you have not filed your monthly report, paid us any amount that is due or breached your obligations regarding Confidential Information, or within 30 days after you receive written notice from us of any other default (except as noted below), then we may terminate this Agreement by written notice to you under Section 11.2. We will not exercise our right to terminate if you have completely cured your default, or until any waiting period required by law has elapsed. In the case of quality assurance default, if you have acted diligently to cure the default but cannot do so and have entered into a written improvement agreement with us within 30 days after the failing inspection, you may cure the default within 90 days after the failing inspection. We may terminate the License if you do not perform that improvement agreement.

11.2 **Termination.** We may terminate the License, or this Agreement if the Opening Date has not occurred, effective when we send written notice to you or such later date as required by law or as stated in the default notice, when (1) you do not cure a default as provided in Section 11.1 or we are authorized to terminate under Section 3.1, (2) you discontinue operating the Facility as a "Days Inn", (3) you do or perform, directly or indirectly, any act or failure to act that in our reasonable judgment is or could be injurious or prejudicial to the goodwill associated with the Marks or the System, (4) you lose possession or the right to possession of the Facility, (5) you (or any guarantor) suffer the termination of another license or License Agreement with us or one of our affiliates, (6) you intentionally maintain false books and records or submit a materially false report to us, (7) you (or any guarantor) generally fail to pay debts as they come due in the ordinary course of business, (8) you, any guarantor or any of your owners or agents misstated to us or omitted to tell us a material fact to obtain or maintain this Agreement with us, (9) you receive two or more notices of default from us in any one year period (whether or not you cure the defaults), (10) a violation of Section 9 occurs, or a Transfer occurs before the relicensing process is completed, (11) you or any of your Equity Interest owners contest in court the ownership or right to franchise or license all or any part of the System or the validity of any of the Marks, (12) you, any guarantor or the Facility is subject to any voluntary or involuntary bankruptcy, liquidation, dissolution, receivership, assignment, reorganization, moratorium, composition or a similar action or proceeding that is not dismissed within 60 days after its filing, or (13) you maintain or operate the Facility in a manner that endangers the health or safety of the Facility's guests.

13

### 11.3  Casualty and Condemnation.

11.3.1  You will notify us promptly after the Facility suffers a Casualty that prevents you from operating in the normal course of business, with less than 75% of guest rooms available. You will give us information on the availability of guest rooms and the Facility's ability to honor advance reservations. You will tell us in writing within 60 days after the Casualty whether or not you will restore, rebuild and refurbish the Facility to conform to System Standards and its condition prior to the Casualty. This restoration will be completed within 180 days after the Casualty. You may decide within the 60 days after the Casualty, and if we do not hear from you, we will assume that you have decided, to terminate this Agreement, effective as of the date of your notice or 60 days after the Casualty, whichever comes first. If this Agreement so terminates, you will pay all amounts accrued prior to termination and follow the post-termination requirements in Section 13. You will not be obligated to pay Liquidated Damages if the Facility will no longer be used as an extended stay or transient lodging facility after the Casualty.

11.3.2  You will notify us in writing within 10 days after you receive notice of any proposed Condemnation of the Facility, and within 10 days after receiving notice of the Condemnation date. This Agreement will terminate on the date the Facility or a substantial portion is conveyed to or taken over by the condemning authority.

### 11.4  Our Other Remedies.

We may suspend the Facility from the Reservation System for any default or failure to pay or perform under this Agreement or any other written agreement with us relating to the Facility, discontinue Reservation System referrals to the Facility for the duration of such suspension, and may divert previously made reservations to other Chain Facilities after giving notice of non-performance, non-payment or default. All Basic Service Charges accrue during the suspension period. We may deduct points under our quality assurance inspection program for your failure to comply with this Agreement or System Standards. Reservation service will be restored after you have fully cured any and all defaults and failures to pay and perform. We may charge you, and you must pay as a condition precedent to restoration of reservation service, a Service Interruption Fee specified on Schedule C to reimburse us for our costs associated with service suspension and restoration. We may omit the Facility from the Directory if you are in default on the date we must determine which Chain Facilities are included in the Directory. You recognize that any use of the System not in accord with this Agreement will cause us irreparable harm for which there is no adequate remedy at law, entitling us to injunctive and other relief. We may litigate to collect amounts due under this Agreement without first issuing a default or termination notice. Our consent or approval may be withheld if needed while you are in default under this Agreement or may be conditioned on the cure of all your defaults.

### 11.5  Your Remedies.

If we fail to issue our approval or consent as and when required under this Agreement within a reasonable time of not less than 30 days after we receive all of the information we request, and you believe our refusal to approve or consent is wrongful, you may bring a legal action against us to compel us to issue our approval or consent to the obligation. To the extent permitted by applicable law, this action shall be your exclusive remedy. We shall not be responsible for direct, indirect, special, consequential or exemplary damages, including, but not limited to, lost profits or revenues.

14

## 12. Liquidated Damages.

12.1 **Generally.** If we terminate the License under Section 11.2, or you terminate this Agreement (except under Section 11.3 or as a result of our default which we do not cure within a reasonable time after written notice), you will pay us within 30 days following the date of termination, as Liquidated Damages, an amount equal to the sum of accrued Royalties and Basic Service Charges during the immediately preceding 24 full calendar months (or the number of months remaining in the unexpired Term (the "Ending Period") at the date of termination, whichever is less). If the Facility has been open for fewer than 24 months, then the amount shall be the average monthly Royalties and Basic Service Charges since the Opening Date multiplied by 24. You will also pay any applicable Taxes assessed on such payment and Interest calculated under Section 7.3 accruing from 30 days after the date of termination. Before the Ending Period, Liquidated Damages will not be less than the product of $2,000 multiplied by the number of guest rooms you are then authorized to operate under Schedule B of this Agreement, as amended. If we terminate this Agreement under Section 3 before the Opening Date, you will pay us within 10 days after you receive our notice of termination Liquidated Damages equal to one-half the amount payable for termination under Section 11.2. Liquidated Damages are paid in place of our claims for lost future Recurring Fees under this Agreement. Our right to receive other amounts due under this Agreement is not affected.

12.2 **Condemnation Payments.** In the event a Condemnation is to occur, you will pay us the fees set forth in Section 7 for a period of one year after we receive the initial notice of condemnation described in Section 11.3.2, or until the Condemnation occurs, whichever is longer. You will pay us Liquidated Damages equal to the average daily Royalties and Basic Service Charges for the one year period preceding the date of your condemnation notice to us multiplied by the number of days remaining in the one year notice period if the Condemnation is completed before the one year notice period expires. This payment will be made within 30 days after Condemnation is completed (when you close the Facility or you deliver it to the condemning authority). You will pay no Liquidated Damages if the Condemnation is completed after the one year notice period expires, but you must pay the fees set forth in Section 7 when due until Condemnation is completed.

## 13. Your Duties At and After Termination. When the License or this Agreement terminates for any reason whatsoever:

13.1 **System Usage Ceases.** You will immediately stop using the System to operate and identify the Facility. You will remove all signage and other items bearing any Marks and follow the other steps detailed in the System Standards Manual for changing the identification of the Facility. You will promptly paint over or remove the Facility's distinctive System trade dress, color schemes and architectural features. You shall not identify the Facility with a confusingly similar mark or name, or use the same colors as the System trade dress for signage, printed materials and painted surfaces. You will cease all Internet marketing using any Marks to identify the Facility.

13.2 **Other Duties.** You will pay all amounts owed to us under this Agreement within 10 days after termination. You will owe us Recurring Fees on Gross Room Revenues accruing while the Facility is identified as a "Days Inn", including Basic Service Charges for so long as the Facility receives service from the Reservation System. We may immediately remove the Facility from the Reservation System and divert reservations as authorized in Section 11.4. We may notify third

parties that the Facility is no longer associated with the Chain. We may also, to the extent permitted by applicable law, and without prior notice enter the Facility and any other parcels, remove software (including archive and back-up copies) for accessing the Reservation System, all copies of the System Standards Manual, Confidential Information, equipment and all other personal property of ours, and paint over or remove and purchase for $10.00, all or part of any interior or exterior Mark-bearing signage (or signage face plates), including billboards, whether or not located at the Facility, that you have not removed or obliterated within five days after termination. You will promptly pay or reimburse us for our cost of removing such items, net of the $10.00 purchase price for signage. We will exercise reasonable care in removing or painting over signage. We will have no obligation or liability to restore the Facility to its condition prior to removing the signage. We shall have the right, but not the obligation, to purchase some or all of the Facility's Mark-bearing FF&E and supplies at the lower of their cost or net book value, with the right to set off their aggregate purchase price against any sums then owed us by you.

13.3  **Advance Reservations.**  The Facility will honor any advance reservations, including group bookings, made for the Facility prior to termination at the rates and on the terms established when the reservations are made and pay when due all related travel agent commissions.

13.4  **Survival of Certain Provisions.**  Sections 3.8 (as to audits, for 2 years after termination), 3.13, 7 (as to amounts accruing through termination), 8, 11.4, 12, 13, 15, 16 and 17 survive termination of the License and this Agreement, whether termination is initiated by you or us, even if termination is wrongful.

**14.  Your Representations and Warranties.** You expressly represent and warrant to us as follows:

14.1  **Quiet Enjoyment and Financing.**  You own, or will own prior to commencing improvement, or lease, the Location and the Facility. You will be entitled to possession of the Location and the Facility during the entire Term without restrictions that would interfere with your performance under this Agreement, subject to the reasonable requirements of any financing secured by the Facility. You have, when you sign this Agreement, and will maintain during the Term, adequate financial liquidity and financial resources to perform your obligations under this Agreement.

14.2  **This Transaction.**  You and the persons signing this Agreement for you have full power and authority and have been duly authorized, to enter into and perform or cause performance of your obligations under this Agreement. You have obtained all necessary approvals of your owners, Board of Directors and lenders. No executory franchise, license or affiliation agreement for the Facility exists other than this Agreement. Your execution, delivery and performance of this Agreement will not violate, create a default under or breach of any charter, bylaws, agreement or other contract, license, permit, indebtedness, certificate, order, decree or security instrument to which you or any of your principal owners is a party or is subject or to which the Facility is subject. Neither you nor the Facility is the subject of any current or pending merger, sale, dissolution, receivership, bankruptcy, foreclosure, reorganization, insolvency, or similar action or proceeding on the date you execute this Agreement and was not within the three years preceding such date, except as disclosed in the Application. You will submit to us the documents about the Facility, you, your owners and your finances that we request in the License Application (or after our review of your

16

initial submissions) before or within 30 days after you sign this Agreement.  To the best of your knowledge, neither you, your owners (if you are an entity), your officers, directors or employees or anyone else affiliated or associated with you, whether by common ownership, by contract, or otherwise, has been designated as, or is, a terrorist, a "Specially Designated National" or a "Blocked Person" under U.S. Executive Order 13224, in lists published by the U.S. Department of the Treasury's Office of Foreign Assets Control, or otherwise.

14.3  **No Misrepresentations or Implied Covenants.**  All written information you submit to us about the Facility, you, your owners, any guarantor, or the finances of any such person or entity, was or will be at the time delivered and when you sign this Agreement, true, accurate and complete, and such information contains no misrepresentation of a material fact, and does not omit any material fact necessary to make the information disclosed not misleading under the circumstances. There are no express or implied covenants or warranties, oral or written, between we and you except as expressly stated in this Agreement.

## 15. Proprietary Rights.

15.1  **Marks and System.**  You will not acquire any interest in or right to use the System or Marks except under this Agreement.  You will not apply for governmental registration of the Marks, or use the Marks or our corporate name in your legal name, but you may use a Mark for an assumed business or trade name filing.

15.2  **Inurements.**  All present and future distinguishing characteristics, improvements and additions to or associated with the System by us, you or others, and all present and future service marks, trademarks, copyrights, service mark and trademark registrations used and to be used as part of the System, and the associated good will, shall be our property and will inure to our benefit.  No good will shall attach to any secondary designator that you use.

15.3  **Other Locations and Systems.**  We and our affiliates each reserve the right to own, in whole or in part, and manage, operate, use, lease, finance, sublease, franchise, license (as licensor or licensee), provide services to or joint venture (i) distinctive separate lodging or food and beverage marks and other intellectual property which are not part of the System, and to enter into separate agreements with you or others (for separate charges) for use of any such other marks or proprietary rights, (ii) other lodging, food and beverage facilities, or businesses, under the System utilizing modified System Standards, and (iii) a Chain Facility at or for any location outside the Protected Territory described in Section 17.8.  You acknowledge that we are affiliated with or in the future may become affiliated with other lodging providers or franchise systems that operate under names or marks other than the Marks.  We and our affiliates may use or benefit from common hardware, software, communications equipment and services and administrative systems for reservations, franchise application procedures or committees, marketing and advertising programs, personnel, central purchasing, approved supplier lists, franchise sales personnel (or independent franchise sales representatives), etc.

15.4  **Confidential Information.**  You will take all appropriate actions to preserve the confidentiality of all Confidential Information.  Access to Confidential Information should be limited to persons who need the Confidential Information to perform their jobs and are subject to

DAYEXCI
166050 8/04

your general policy on maintaining confidentiality as a condition of employment or who have first signed a confidentiality agreement. You will not permit copying of Confidential Information (including, as to computer software, any translation, decompiling, decoding, modification or other alteration of the source code of such software). You will use Confidential Information only for the Facility and to perform under this Agreement. Upon termination (or earlier, as we may request), you shall return to us all originals and copies of the System Standards Manual, policy statements and Confidential Information "fixed in any tangible medium of expression," within the meaning of the U.S. Copyright Act, as amended. Your obligations under this subsection commence when you sign this Agreement and continue for trade secrets (including computer software we license to you) as long as they remain secret and for other Confidential Information, for as long as we continue to use the information in confidence, even if edited or revised, plus three years. We will respond promptly and in good faith to your inquiry about continued protection of any Confidential Information.

15.5 **Litigation.** You will promptly notify us of (i) any adverse or infringing uses of the Marks (or names or symbols confusingly similar), Confidential Information or other System intellectual property, and (ii) or any threatened or pending litigation related to the System against (or naming as a party) you or us of which you become aware. We alone handle disputes with third parties concerning use of all or any part of the System. You will cooperate with our efforts to resolve these disputes. We need not initiate suit against imitators or infringers who do not have a material adverse impact on the Facility, or any other suit or proceeding to enforce or protect the System in a matter we do not believe to be material.

15.6 **The Internet.** You may use the Internet to market the Facility subject to this Agreement and System Standards. You shall not use, license or register any domain name, universal resource locator, or other means of identifying you or the Facility that uses a Mark or any image or language confusingly similar to a Mark without our consent. You will assign to us any such identification at our request without compensation or consideration. You must make available through the Reservation System and the Chain website all rates you offer to the general public via Internet marketing arrangements with third parties. You must participate in the Chain's best available rate on the Internet guarantee or successor program. The content you provide us or use yourself for any Internet marketing must be true, correct and accurate, and you will notify us in writing promptly when any correction to the content becomes necessary. You shall promptly modify at our request the content of any Internet marketing material for the Facility you use, authorize, display or provide to conform to System Standards. Any use of the Marks and other elements of the System on the Internet inures to our benefit under Section 15.2.

## 16. Relationship of Parties.

16.1 **Independence.** You are an independent contractor. You are not our legal representative or agent, and you have no power to obligate us for any purpose whatsoever. We and you have a business relationship based entirely on and circumscribed by this Agreement. No partnership, joint venture, agency, fiduciary or employment relationship is intended or created by reason of this Agreement. You will exercise full and complete control over and have full responsibility for your contracts, daily operations, labor relations, employment practices and policies, including, but not limited to, the recruitment, selection, hiring, disciplining, firing, compensation, work rules and

18

schedules of your employees.

16.2  **Joint Status.**  If you comprise two or more persons or entities (notwithstanding any agreement, arrangement or understanding between or among such persons or entities) the rights, privileges and benefits of this Agreement may only be exercised and enjoyed jointly. The liabilities and responsibilities under this Agreement will be the joint and several obligations of all such persons or entities.

## 17. Legal Matters.

17.1  **Partial Invalidity.**  If all or any part of a provision of this Agreement violates the law of your state (if it applies), such provision or part will not be given effect. If all or any part of a provision of this Agreement is declared invalid or unenforceable, for any reason, or is not given effect by reason of the prior sentence, the remainder of the Agreement shall not be affected. However, if in our judgment the invalidity or ineffectiveness of such provision or part substantially impairs the value of this Agreement to us, then we may at any time terminate this Agreement by written notice to you without penalty or compensation owed by either party.

17.2  **Waivers, Modifications and Approvals.**  If we allow you to deviate from this Agreement, we may insist on strict compliance at any time after written notice. Our silence or inaction will not be or establish a waiver, consent, course of dealing, implied modification or estoppel. All modifications, waivers, approvals and consents of or under this Agreement by us must be in writing and signed by our authorized representative to be effective. We may unilaterally revise Schedule C when this Agreement so permits.

17.3  **Notices.**  Notices will be effective if in writing and delivered (i) by facsimile transmission with confirmation original sent by first class mail, postage prepaid, (ii) by delivery service, with proof of delivery, or (iii) by first class, prepaid certified or registered mail, return receipt requested, to the appropriate party (x) at its address stated below or as it may otherwise designate by notice, or (y) by such other means as to result in actual or constructive receipt by the person or office holder designated below. The parties may also communicate via electronic mail between addresses to be established by notice. You consent to receive electronic mail from us. Notices shall be deemed given on the date delivered or date of attempted delivery, if refused.

DAYS INNS WORLDWIDE, INC.:
Our address:  1 Sylvan Way, P.O. Box 278, Parsippany, New Jersey 07054-0278
Attention: Vice President-Franchise Administration;
 Fax No. (973) 496-5359

Your name: NAIDIP HOSPITALITY-I, LLC,
Your address: 2055 North Dale Mabry , Tampa, FL  33607,
Attention: Jayesh Patel;
Your fax No.: 813 876 4964.

17.4  **Remedies.**  Remedies specified in this Agreement are cumulative and do not exclude any remedies available at law or in equity. The non-prevailing party will pay all costs and expenses,

DAYEXCI
166050 8/04

including reasonable attorneys' fees, incurred by the prevailing party to enforce this Agreement or collect amounts owed under this Agreement.

**17.5  Miscellaneous.** This Agreement is exclusively for the benefit of the parties. There are no third party beneficiaries. No agreement between us and anyone else is for your benefit. The section headings in this Agreement are for convenience of reference only.

**17.6  Choice of Law; Venue; Dispute Resolution.**

17.6.1  This Agreement will be governed by and construed under the laws of the State of New Jersey, except for its conflicts of law principles. The New Jersey Franchise Practices Act will not apply to any Facility located outside the State of New Jersey.

17.6.2  The parties shall attempt in good faith to resolve any dispute concerning this Agreement or the parties' relationship promptly through negotiation between authorized representatives. If these efforts are not successful, either party may attempt to resolve the dispute through non-binding mediation. Either party may request mediation through the National Franchise Mediation Program, using the procedures employed by the CPR Institute for Dispute Resolution, Inc. We will provide you with the contact address for that organization. The mediation will be conducted by a mutually acceptable and neutral third party. If the parties cannot resolve the dispute through negotiation or mediation, or choose not to negotiate or mediate, either party may pursue litigation.

17.6.3  You consent and waive your objection to the non-exclusive personal jurisdiction of and venue in the New Jersey state courts situated in Morris County, New Jersey and the United States District Court for the District of New Jersey for all cases and controversies under this Agreement or between we and you.

**17.6.4  WAIVER OF JURY TRIAL. THE PARTIES WAIVE THE RIGHT TO A JURY TRIAL IN ANY ACTION RELATED TO THIS AGREEMENT OR THE RELATIONSHIP BETWEEN THE LICENSOR, THE LICENSEE, ANY GUARANTOR, AND THEIR RESPECTIVE SUCCESSORS AND ASSIGNS.**

**17.7  Special Acknowledgments.** You acknowledge the following statements to be true and correct as of the date you sign this Agreement, and to be binding on you.
**17.7.1  You received our Uniform Franchise Offering Circular ("UFOC") for prospective licensees at least 10 business days before, and a copy of this Agreement and all other agreements we are asking you to sign at least 5 business days before, signing this Agreement and paying the Initial Fee to us. You have received our UFOC at least 10 business days before you paid any fee to us or signed any contract with us.**

**17.7.2  Neither we nor any person acting on our behalf has made any oral or written representation or promise to you on which you are relying to enter into this Agreement that is not written in this Agreement. You release any claim against us or our agents based on any oral or written representation or promise not stated in this Agreement.**

20

DAYEXC1
166050 8/04

**17.7.3**  This Agreement, together with the exhibits and schedules attached, is the entire agreement superseding all previous oral and written representations, agreements and understandings of the parties about the Facility and the License.

**17.7.4**  You acknowledge that no salesperson has made any promise or provided any information to you about projected sales, revenues, income, profits or expenses from the Facility except as stated in Item 19 of the UFOC or in a writing that is attached to this Agreement.

**17.7.5**  You understand that the franchise relationship is an arms' length, commercial business relationship in which each party acts in its own interest.

**17.8  Protected Territory**.  We will not own, operate, lease, manage, or license any party but you to operate a Chain Facility in the "Protected Territory", defined below, while this Agreement is in effect. We may own, operate, lease, manage, franchise or license anyone to operate any Chain Facility located anywhere outside the Protected Territory without any restriction or obligation to you. We may grant Protected Territories for other Chain Facilities that overlap your Protected Territory. While this Agreement is in effect, neither you nor your officers, directors, general partners or owners of 25% or more of your Equity Interests, may own, operate, lease, manage or franchise any guest lodging facility other than the Facility in the Protected Territory unless we or our affiliate licenses the facility. You will use any information obtained through the Reservation System to refer guests, directly or indirectly, only to Chain Facilities. This Section does not apply to any Chain Facility located in the Protected Territory on the Effective Date, which we may renew, relicense, allow to expand, or replace with a replacement Facility located within the same trading area having not more than 120% of the guest rooms of the replaced Chain Facility if its license with us terminates or is not renewed. The Protected Territory fairly represents the Facility's trading area, and you acknowledge that. There are no express or implied territorial rights or agreements between the parties except as stated in this Section. By electing to include this section in your Agreement, you irrevocably waive any right to seek or obtain the benefits of any policy we now follow or may in the future follow to notify you about proposed Chain Facilities in the general area of the Facility, solicit information about the effect of the proposed Chain Facility on the revenue or occupancy of the Facility or decide whether to add the proposed Chain Facility to the Chain based on the potential effect of the proposed Chain Facility on the Facility or its performance. The covenants in this Section are mutually dependent; if you breach this Section, your Protected Territory will be the Location only. **The Protected Territory means (i) the area within 1/4 mile on either side of the centerline of Dale Mabry (Highway 600) commencing at the intersection of Dale Mabry and Hillsborough Avenue (Latitude 27.9957° N and Longitude 82.5051° W) and proceeding south on Dale Mabry up to the intersection with Gandy Boulevard (Latitude 27.8939° N and Longitude 82.5064° W); and (ii) the area within 1/4 mile on either side of the centerline of I-275 commencing at Exit 40A (Latitude 27.9507° N and Longitude 82.5208° W) and proceeding north on I-275 up to exit 42 (Latitude 27.9561° N and Longitude 82.4882° W).**

DAYEXC1
166050 8/04

**18.   Special Stipulations.**   The following special stipulations apply to this Agreement and supersede any inconsistent or conflicting provisions.  You acknowledge that these stipulations and any changes made to the body of the Agreement at your request or in response to other changes to our form agreement are the product of arms' length negotiations with us and represent mutually agreed, material inducements to enter into this Agreement, beneficial to you and supported by adequate consideration from both parties.  These are personal to you and are not transferable or assignable except to a Permitted Transferee.

18.1.  **Special Recurring Fees.**  Notwithstanding Section 7.1, you will pay the "Recurring Fee," consisting of the Royalty and the System Assessment Fee (excluding agent and property to property commissions, Internet fees, guest reward and affinity program fees, service fees and charges, guest complaint assessments, and GDS Fees), to us at the rates set forth in this Section, **provided that the Facility opens in accordance with the deadline established by the terms of this Agreement:**

18.1.1  The Recurring Fee shall be six and eight tenths percent (6.8%) of Gross Room Revenues accruing during the first and second License Years; and

18.1.2  The Royalty and System Assessment Fee shall be computed and paid at the rates specified in Section 7.1 on Gross Room Revenues accruing after the second License Year.

18.1.3  The rate changes set forth in this Section automatically terminate without notice or opportunity to cure, and the Recurring Fee shall reset to the rates specified in Section 7, if and as of the date (i) a Termination occurs, or we send you a notice of default and you fail to cure the default within the time specified, if any, in the notice of default, or (ii) after you satisfy the Improvement Obligation, the Facility receives a quality assurance inspection score of less than 425 (or its then equivalent) and the Facility fails to achieve a quality assurance inspection score of at least 425 in a reinspection to be performed not less than 30 days after the initial inspection.

18.2  **Liquidated Damages.**  Liquidated Damages payable under Section 12.1 for a Termination that occurs before the last two License Years will be the lesser of either (i) $1,000.00   for each guest room of the Facility you are authorized to operate at the time of Termination or (ii) the total amount of Recurring Fees generated at the Facility during the one year period immediately before the date of termination.

18.3  **Your Additional Termination Right.**  You may terminate the License without cause or penalty effective only on the 7th anniversary of the Opening Date provided you give us at least six (6) months prior written notice of termination and you are not in default under this Agreement at the time notice must be given or at the effective date of termination.  You will pay no Liquidated Damages if you satisfy the conditions of the preceding sentence and you perform the post termination obligations specified in this Agreement within 10 days after the effective date of termination.  Your rights under this Section will automatically terminate without notice if and as of the date (i) a Termination occurs, (ii) you fail to cure any default under this Agreement within the time permitted, if any, in the notice of default we send you, or (iii) after the Facility satisfies the Improvement Obligation, the Facility scores less than 425 points (or its then equivalent) on a quality assurance inspection and then fails to achieve a score of at least 425 points (or its then

22

equivalent) in a reinspection to be performed no sooner than 90 days after the initial inspection. You will not exercise this right if the Facility is then financed under a program in which the United States Small Business Administration ("SBA") guarantees the financing or its repayment unless you first obtain SBA's consent.

18.4  **Our Additional Termination Right.**   We may terminate the License without cause or penalty effective only on the 7th anniversary of the Opening Date provided we give you at least six (6) months prior written notice of termination.  You will perform the post termination obligations specified in this Agreement within 10 days after the effective date of termination.  You will pay no Liquidated Damages if we terminate the License under this Section and you perform the post termination obligations specified in this Agreement within 10 days after the effective date of termination. We will not exercise this right if you notify us that the Facility is then financed under a program in which the United States Small Business Administration ("SBA") guarantees the financing or its repayment unless we first obtain SBA's consent.

18.5  **Your Additional Termination Right.**   You have represented to us that you may demolish the Facility and rebuild for a use other than as guest lodging facility in the future.  In the even you elect to do so, you may terminate the License at any time after giving us as least one (1) year  prior written notice.  You must not be in default under this Agreement at the time of notice must be given or at the effective termination date.  If you comply this section,   you will not be liable to pay Liquidated Damages or any other termination fee on the termination date, provided that (i) you timely pay all Recurring Fees accruing through the termination date, (ii) the Facility has all System identification completely removed within ten days after the termination date, and (iii) the post-termination obligations are timely completed.  Instead of paying Liquidated Damages, you and your co-makers will execute and deliver to us a Promissory Note for the applicable amount of Liquidated Damages, in the from we specify.  The Note will be due and payable on the first anniversary of the termination date.  However, the Note will be cancelled on the day before the first anniversary of the termination date if the Facility was not used for transient guest lodging during that one-year period.  If you do not satisfy these conditions or if the Facility is used for transient guest lodging within one year after the termination date, you will pay us the applicable amount of Liquidated Damages as of the termination date within ten days after our written demand to you.

{BALANCE OF PAGE LEFT INTENTIONALLY BLANK}

DAYEXC1
166050 8/04



IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first stated above.

**WE:**
**DAYS INNS WORLDWIDE, INC.:**

By: _____
Richard M. Saltzman
Vice President
Franchise Administration

Attest: _____
Assistant Secretary

**YOU**, as licensee:
**NAIDIP HOSPITALITY-I, LLC**

By: _____
Print Name: Jayesh Patel
Managing Member

Witness: _____

DAYEXC1
166050 8/04

## APPENDIX A

### DEFINITIONS

Agreement means this License Agreement.

Application Fee means the fee you pay when you submit your Application under Section 6.

Approved Plans means your plans and specifications for constructing or improving the Facility initially or after opening, as approved by us under Section 3.

Casualty means destruction or significant damage to the Facility by act of God or other event beyond your reasonable anticipation and control.

Chain means the network of Chain Facilities.

Chain Facility means a lodging facility we own, lease, manage, operate or authorize another party to operate using the System and identified by the Marks.

Condemnation means the taking of the Facility for public use by a government or public agency legally authorized to do so, permanently or temporarily, or the taking of such a substantial portion of the Facility that continued operation in accordance with the System Standards, or with adequate parking facilities, is commercially impractical, or if the Facility or a substantial portion is sold to the condemning authority in lieu of condemnation.

Conference Fee means the fee we charge for your attendance at a conference for Chain Facilities and their licensees when and if held.

Confidential Information means any trade secrets we own or protect and other proprietary information not generally known to the lodging industry including confidential portions of the System Standards Manual or information we otherwise impart to you and your representatives in confidence. Confidential Information includes the "Rules of Operation Manual" and all other System Standards manuals and documentation, including those on the subjects of employee relations, finance and administration, field operation, purchasing and marketing, the Reservation System software and applications software.

Design Standards mean standards specified in the System Standards Manual from time to time for design, construction, renovation, modification and improvement of new or existing Chain Facilities, including all aspects of facility design, number of rooms, rooms mix and configuration, construction materials, workmanship, finishes, electrical, mechanical, structural, plumbing, HVAC, utilities, access, life safety, parking, systems, landscaping, amenities, interior design and decor and the like for a Chain Facility.

DAYEXC1
166050 8/04

Directory means the general purpose directory we publish listing the names and addresses of Chain Facilities, and at our discretion, other Days Inn facilities located outside the United States, Canada and Mexico.

Effective Date means the date that you first take possession of the Facility.

Equity Interests shall include, without limitation, all forms of equity ownership of you, including voting stock interests, partnership interests, limited liability company membership or ownership interests, joint and tenancy interests, the proprietorship interest, trust beneficiary interests and all options, warrants, and instruments convertible into such other equity interests.

Equity Transfer means any transaction in which your owners or you sell, assign, transfer, convey, pledge, or suffer or permit the transfer or assignment of, any percentage of your Equity Interests that will result in a change in control of you to persons other than those disclosed on Schedule B, as in effect prior to the transaction. Unless there are contractual modifications to your owners' rights, an Equity Transfer of a corporation or limited liability company occurs when either majority voting rights or beneficial ownership of more than 50% of the Equity Interests changes. An Equity Transfer of a partnership occurs when a newly admitted partner will be the managing, sole or controlling general partner, directly or indirectly through a change in control of the Equity Interests of an entity general partner. An Equity Transfer of a trust occurs when either a new trustee with sole investment power is substituted for an existing trustee, or a majority of the beneficiaries convey their beneficial interests to persons other than the beneficiaries existing on the Effective Date. An Equity Transfer does not occur when the Equity Interest ownership among the owners of Equity Interests on the Effective Date changes without the admission of new Equity Interest owners. An Equity Transfer occurs when you merge, consolidate or issue additional Equity Interests in a transaction which would have the effect of diluting the voting rights or beneficial ownership of your owners' combined Equity Interests in the surviving entity to less than a majority.

Facility means the Location, together with all improvements, buildings, common areas, structures, appurtenances, facilities, entry/exit rights, parking, amenities, FF&E and related rights, privileges and properties existing at the Location on the Effective Date or afterwards.

FF&E means furniture, fixtures and equipment.

FF&E Standards means standards specified in the System Standards Manual for FF&E and supplies to be utilized in a Chain Facility.

Food and Beverage means any restaurant, catering, bar/lounge, entertainment, room service, retail food or beverage operation, continental breakfast, food or beverage concessions and similar services offered at the Facility.

Gross Room Revenues means gross revenues attributable to or payable for rentals of guest rooms at the Facility, including all credit transactions, whether or not collected, but excluding separate charges to guests for Food and Beverage, room service, telephone charges, key forfeitures and entertainment; vending machine receipts; and federal, state and local sales, occupancy and use taxes.

DAYEXC1
166050 8/04

Improvement Obligation means your obligation to either (i) renovate and upgrade the Facility, or (ii) construct and complete the Facility, in accordance with the Approved Plans and System Standards, as described in Section 3.

Indemnitees means us, our direct and indirect parent, subsidiary and sister corporations, and the respective officers, directors, shareholders, employees, agents and contractors, and the successors, assigns, personal representatives, heirs and legatees of all such persons or entities.

Initial Entry Charge means the fee you are to pay for gaining access to the Reservation System when you sign this Agreement and on the first and second anniversaries of the Effective Date under Section 6.2.

Initial Fee means the fee you are to pay for signing this Agreement as stated in Section 6.1.

License means the non-exclusive license to operate the type of Chain Facility described in Schedule B only at the Location, using the System and the Mark we designate in Section 1.

License Year means:

   (i) *If the Opening Date occurs on the first day of a month:* the period beginning on the Opening Date and ending on the day immediately preceding the first anniversary of the Opening Date, and each subsequent one year period; or

   (ii) *If the Opening Date does not occur on the first day of a month:* the period beginning on the Opening Date and ending on the first anniversary of the last day of the month in which the Opening Date occurs, and each subsequent one year period.

Liquidated Damages means the amounts payable under Section 12, set by the parties because actual damages will be difficult or impossible to ascertain on the Effective Date and the amount is a reasonable pre-estimate of the damages that will be incurred and is not a penalty.

Location means the parcel of land situated at **2522 North Dale Mabry Highway, Tampa, FL 33607**, as more fully described in Schedule A.

Losses and Expenses means (x) all payments or obligations to make payments either (i) to or for third party claimants by any and all Indemnitees, including guest refunds, or (ii) incurred by any and all Indemnitees to investigate, respond to or defend a matter, including without limitation investigation and trial charges, costs and expenses, attorneys' fees, experts' fees, court costs, settlement amounts, judgments and costs of collection; and (y) the "Returned Check Fee" we then specify in the System Standards Manual ($20.00 on the Effective Date) if the drawee dishonors any check that you submit to us.

Maintenance Standards means the standards specified from time to time in the System Standards Manual for repair, refurbishment and replacement of FF&E, finishes, decor, and other capital items and design materials in Chain Facilities.

DAYEXCI
166050 8/04

Marks means, collectively (i) the service marks associated with the System published in the System Standards Manual from time to time including, but not limited to, the name, design and logo for "Days Inn" and other marks (U.S. Reg. Nos.: 1,160,430; 1,160,431; 1,420,612; 1,469,518; and 1,003,834) and (ii) trademarks, trade names, trade dress, logos and derivations, and associated good will and related intellectual property interests.

Marks Standards means standards specified in the System Standards Manual for interior and exterior Mark-bearing signage, advertising materials, china, linens, utensils, glassware, uniforms, stationery, supplies, and other items, and the use of such items at the Facility or elsewhere.

Minor Renovation means the repairs, refurbishing, repainting, and other redecorating of the interior, exterior, guest rooms, public areas and grounds of the Facility and replacements of FF&E we may require you to perform under Section 3.16.

Minor Renovation Ceiling Amount means $3,000.00 per guest room.

Minor Renovation Notice means the written notice from us to you specifying the Minor Renovation to be performed and the dates for commencement and completion given under Section 3.16.

Opening Date means the date on which we authorize you to open the Facility for business identified by the Marks and using the System.

Operations Standards means standards specified in the System Standards Manual for cleanliness, housekeeping, general maintenance, repairs, concession types, food and beverage service, vending machines, uniforms, staffing, employee training, guest services, guest comfort and other aspects of lodging operations.

Permitted Transferee means (i) any entity, natural person(s) or trust receiving from the personal representative of an owner any or all of the owner's Equity Interests upon the death of the owner, if no consideration is paid by the transferee or (ii) the spouse or adult issue of the transferor, if the Equity Interest transfer is accomplished without consideration or payment, or (iii) any natural person or trust receiving an Equity Interest if the transfer is from a guardian or conservator appointed for an incapacitated or incompetent transferor.

Punch List means the list of upgrades and improvements attached as part of Schedule B, which you are required to complete under Section 3.

Recurring Fees means fees paid to us on a periodic basis, including without limitation, Royalties, System Assessment Fees, Basic Service Charges, and other reservation fees and charges as stated in Section 7.

Relicense Fee means the fee your transferee or you pay to us under Section 7 when a Transfer occurs.

28

DAYEXC1
166050 8/04

System Assessment Fees means the fees you pay to us under Section 7 and Schedule C for reservation services, including the Basic Service Charge and any other fees we charge for services provided by or through the Reservation System.

Reservation System or "Central Reservation System" means the system for offering to interested parties, booking and communicating guest room reservations for Chain Facilities described in Section 4.2.

Rooms Addition Fee means the fee we charge you for adding guest rooms to the Facility.

Royalty means the monthly fee you pay to us for use of the System under Section 7(a). "Royalties" means the aggregate of all amounts owed as a Royalty.

Service Interruption Fee means the fee you pay us when we suspend Central Reservation System service because you default under this Agreement, in the amount specified in Schedule C.

System means the comprehensive system for providing guest lodging facility services under the Marks as we specify which at present includes only the following:   (a) the Marks; (b) other intellectual property, including Confidential Information, System Standards Manual and know-how; (c) marketing, advertising, publicity and other promotional materials and programs; (d) System Standards; (e) training programs and materials; (f) quality assurance inspection and scoring programs; and (g) the Reservation System.

System Standards means the standards for the participating in the System published in the System Standards Manual, including but not limited to Design Standards, FF&E Standards, Marks Standards, Operations Standards, Technology Standards and Maintenance Standards and any other standards, policies, rules and procedures we promulgate about System operation and usage.

System Standards Manual means the Operating Policies Manual, the Planning and Design Standards Manual and any other manual we publish or distribute specifying the System Standards.

Taxes means the amounts payable under Section 7.2 of this Agreement.

Technology Standards means standards specified in the System Standards Manual for local and long distance telephone communications services, telephone, telecopy and other communications systems, point of sale terminals and computer hardware and software for various applications, including, but not limited to, front desk, rooms management, records maintenance, marketing data, accounting, budgeting and interfaces with the Reservation System to be maintained at the Chain Facilities.

Term means the period of time during which this Agreement shall be in effect, as stated in Section 5.

Termination means a termination of the License under Sections 11.1 or 11.2 or your termination of the License or this Agreement.

DAYEXC1
166050 8/04

Transfer means (1) an Equity Transfer, (2) you assign, pledge, transfer, delegate or grant a security interest in all or any of your rights, benefits and obligations under this Agreement, as security or otherwise without our consent as specified in Section 9, (3) you assign (other than as collateral security for financing the Facility) your leasehold interest in (if any), lease or sublease all or any part of the Facility to any third party, (4) you engage in the sale, conveyance, transfer, or donation of your right, title and interest in and to the Facility, (5) your lender or secured party forecloses on or takes possession of your interest in the Facility, directly or indirectly, or (6) a receiver or trustee is appointed for the Facility or your assets, including the Facility.  A Transfer does not occur when you pledge or encumber the Facility to finance its acquisition or improvement, you refinance it, or you engage in a Permitted Transferee transaction.

"You" and "Your" means and refers to the party named as licensee identified in the first paragraph of this Agreement and its Permitted Transferees.

"We", "Our" and "Us" means and refers to Days Inns Worldwide, Inc., a Delaware corporation, its successors and assigns.

DAYEXCI
166080  8/04

10/17/2003  12:50    46    251352         D&PA COMPLIANCE         PAGE  04/04

Non-certified document provided 2003.713839 Copyright 2003, All rights reserved

## EXHIBIT "A"

The North 300 feet of the East 435.6 feet of Lot 1, of PORTER PLAZA, according to the plat of record in the office of the County Recorder of Maricopa County, Arizona, recorded in Book 186 of Maps, Page 40.

06875 CO DI

**Days Inns Worldwide, Inc.**
Punchlist for Change of Ownership
"Schedule B Part III"
07/07/2004
Revised on April 4, 2005

Page: 1   of 4

Tier:  Inn



| OWNER APPLICANT | | ROOM DIMENSIONS - EXISTING | | | | | | GUESTROOMS | |
|---|---|---|---|---|---|---|---|---|---|
| Property Name: | Days Inn #6875 | For Rms 275 | 12 | (width) x | 24 | (length) = 268.00 sq. ft. | TOTAL ROOMS | 296 | |
| Property Address: | 2522 Dale Mabry Hwy | F of Rms 20 | 14 | (width) x | 24 | (length) = 336.00 sq. ft. | RENTABLE: | 296 | |
| City | Tampa | St FL | Zip 33607 | F of Rms ___ | | (width) x | (length) = ___ sq. ft. | | |
| Conversion Consultant: | Rick Terrell | | F of Rms ___ | | (width) x | (length) = ___ sq. ft. | | |
| Owner/Applicant: | Jayesh Patel | | F of Rms ___ | | (width) x | (length) = ___ sq. ft. | | |
| Phone | (813) 784-7710 | | F of Rms ___ | | (width) x | (length) = ___ sq. ft. | | |
| Contant Contact: | Van Jernigan | | | | | | | |
| Phone: | (404) 229-6588 | | ROOM DIMENSION STANDARD  288 SF | | | | | |

**PROPERTY CONDITION SUMMARY**

This property is located in a "Level A" market and consists of 4 exterior corridor guestroom buildings, 1 commercial building and 2 outdoor pools.  The buildings are of concrete block construction with stucco facades.  The commercial building and one guestroom building have pitched roofs and the three remaining guestroom buildings have parapet rooflines.  All guestroom buildings are two story, two are single-loaded and two are double-loaded.

This hotel is located between the airport and downtown Tampa on the Dale Mabry Hwy.  The property's occupancy is quite diverse with corporate clientele, tourism and leisure business and extended stay business made up of construction crews.

| PUBLIC AREA DIMENSIONS - EXISTING | | | STANDARD | PUBLIC AREA DIMENSIONS - EXISTING | | | STANDARD |
|---|---|---|---|---|---|---|---|
| Lobby/Breakfast Area | 10 | (width) x 41 (length) = 410.00 sq. ft. | | Meeting Room | 16 | (width) x 36 (length) = 576.00 sq. ft. | N/A |
| Lobby/Breakfast Area | 21 | (width) x 25 (length) = 525.00 sq. ft. | 800 SF | Meeting Room | 15 | (width) x 21 (length) = 315.00 sq. ft. | N/A |
| Meeting Room | 27 | (width) x 36 (length) = 972.00 sq. ft. | N/A | | (width) x | (length) = ___ sq. ft. | |

**BRAND VARIANCES**

ONLY THE FRANCHISOR MAY REVISE THIS PUNCHLIST.  PUNCHLIST VOID 180 DAYS AFTER INSPECTION DATE UNLESS FRANCHISE OR LICENSE AGREEMENT BECOMES EFFECTIVE.

This Punchlist identifies actions needed to cause the Facility to meet the Franchisor's standards.  You are solely responsible for compliance of the Facility with applicable federal, state and local laws, codes, ordinances and regulations.
You have been provided a Punchlist Reference Guide to assist in compliance with punchlist completion and Brand Standards.
This Punchlist was based on a random sample inspection of the Facility on the date specified.  You may need to take additional actions to meet our Standards, or comply with law, or at our discretion if we modify our Standards or the condition of the Facility changes materially after the inspection date.
The Franchise Review Committee may in its discretion revise this Punchlist as a condition of approving your application.
You should not consider this Punchlist to be final until we sign the License or Franchise Agreement.

| | revised on | ks |
|---|---|---|
| | 7/30/04 | |
| | 8/10/04 | KS |
| | 2/7/05 | AMS |
| | 4/4/05 | ams |

Signed: _____   Date: _____
Print Name: _____

Quality Assurance

Initials _____   Page

06875 CO DI

| EXTERIOR | | |
|---|---|---|
| COMPLETION DATE | SCOPE OF WORK | For Office Use Only |
| 180 days from new license agreement | Replace unapproved highrise sign. Contact the Brand Identity Department for assistance with approved graphics. | |
| 180 days from new license agreement | Exterior renovation plans must be approved prior to commencement of work thru written approval by the Design/Development Department reached at (973) 496-2525. At a minimum, plans should include roofline modification, Company design features, staircase towers, etc. | |
| 180 days from new license agreement | The enhancement of the current parapet roofline around the perimeter of the buildings is required to improve the property's curb appeal. A standing seam mansard roof based on the current roofline appearance is required. | |
| 180 days from new license agreement | The enhancement of the current pitched roof around the perimeter of the "F" building is required. A stucco parapet is required to be consistent with existing guestroom buildings. | |
| 180 days from new license agreement | It is required for all guestroom building roofs to be consistent throughout the property. | |
| 180 days from new license agreement | Construct staircase towers and incorporate existing parapet and new roofline as well as Company design features to both sets of stairs to the north end of buildings "B" and "E". Modify existing staircase towers to match new staircase towers. | |
| 180 days from new license agreement | Reconstruct burned Maintenance facility restoring all exterior finishes and facade to a like new condition and appearance. | |
| 180 days from new license agreement | Paint building exteriors (doors, fascia and soffits). | |
| 180 days from new license agreement | Repair soffits where damaged as to the east end of building "D" | |
| 180 days from new license agreement | Pressure wash walkways to eliminate stains. | |
| 180 days from new license agreement | Reseal and stripe parking lot. Repair curbing where damaged and broken. Repaint curbing. | |
| 180 days from new license agreement | Repair/refinish both pool decks. Replace worn/faded green pieces of pool furniture to provide a uniform package. | |
| 30 days from new license agreement | Install landscaping at the base of the hi-rise sign (per sample OP-4), to parking lot islands (per sample IS-4) and to building perimeter beds (per sample ST-5). Samples are provided in the Punchlist Reference Guide. | |
| | | |

Quality Assurance

Initials:                PAGE 2/3

06675 CO DI

| PUBLIC AREAS | | |
|---|---|---|
| COMPLETION DATE | SCOPE OF WORK | For Office Use Only |
| Immediate compliance | Ensure facilities to assist the handicapped in accordance with local, state and federal codes, regulations and ordinances are provided. | |
| Immediate compliance | All owners/general managers are required to attend all Brand orientation/training. Provide USA Today Newspapers. | |
| Immediate compliance | Provide a Daybreak breakfast per Company specifications. | |
| 30 days from new license agreement | Clean/paint lobby/breakfast area ceilings to eliminate discoloration around AC vents. | |
| 30 days from new license agreement | Clean/refinish ice machine cabinets where rusted and discolored. | |
| 30 days from new license agreement | Deep clean meeting room chairs to eliminate spots and stains. | |
| 90 days from new license agreement | Property manager is required to be TripRewards certified and property must fully comply with all TripRewards requirements. | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

Quality Assurance

Initials          Figure

06875 CO DI                                                                          Page 4  of 4

## GUESTROOMS

ROOMS INSPECTED  1006, 1030, 1037, 1038, 1060, 1360, 1342, 1409, 1410, 1418, 1532, 1534, 1538, 2020, 2040, 2044, 2370, 2328, 2417, 2419, 2423 and 2524

| COMPLETION DATE | SCOPE OF WORK | For Office Use Only |
|---|---|---|
| Immediate compliance | Ensure facilities to assist the handicapped in accordance with local, state and federal codes, regulations and ordinances are provided. | |
| Immediate compliance | Provide/replace smoke detectors per Company specifications where missing as in room #1530. | |
| 180 days after opening | Paint ceilings where paint finish is damaged and peeling as in room #1006. | |
| 180 days from new license agreement | Replace carpet where worn and matted as in rooms #1030 and #1342. | |
| 30 days from new license agreement | Deep clean leisure and desk chairs to eliminate stains and spots as in room #1009. | |
| 180 days from new license agreement | Provide a matching second nightstand in one-bedded rooms where missing one as in room #1409. | |
| 180 days from new license agreement | Replace plumbing fixtures/trim (sinks and tubs) where tarnished or corroded (faucets, drains rings, etc.) as in room #1006. | |
| 180 days from new license agreement | Repair/replace bathroom vinyl wallcovering where seaming as in room #2320. | |
| 180 days from new license agreement | Deep clean/regrout bathroom floors to eliminate stained and discolored grout. | |
| | | |
| | | |
| | | |
| | | |

Quality Assurance

## SCHEDULE B

PART I:       YOUR OWNERS:

| Name | Ownership Percentage | Type of Equity Interest |
|------|---------------------|------------------------|
| **Jayesh Patel** | **100.00%** | **Common Stock** |

PART II:       THE FACILITY:

Primary designation of Facility: Days Inn

Number of approved guest rooms: 296.

Parking facilities (number of spaces, description): 296.

Other amenities, services and facilities:

PART III:      DESCRIPTION AND SCHEDULE OF RENOVATIONS TO BE
               COMPLETED AS THE IMPROVEMENT OBLIGATION:

**[Punch List to be attached.]**

DAYEXC1
166050 8/04

**DAYS INNS WORLDWIDE, INC.**
**SCHEDULE C**
**August 2004**

A.    System Assessment Fees

The System Assessment Fee includes the Basic Service Charge equal to 3.8% of Gross Room Revenues. We reserve the right to increase or modify the Basic Service Charge and any Additional Charges for all Chain Facilities in the United States and to add other fees and charges for new services, at our sole discretion as to amount or formula from time to time but with at least 30 days prior written notice and after consultation with the Board of Directors of the Days Inns Franchisee Advisory Association, and to add, drop or modify the types of services offered.

B.    Mandatory Marketing Program Charge

We charge a Mandatory Marketing Program Charge for your participation in the TripRewards® or successor guest loyalty program. Under TripRewards, program members staying at qualifying rates at Chain Facilities earn their choice of TripRewards points, airline miles or other program currency. TripRewards points are redeemable for free stays at Chain Facilities and for travel, merchandise, entertainment and other awards. The Mandatory Marketing Program Charge is up to 5% of the Gross Room Revenues accruing from each qualifying stay at the Facility. We will proactively match and award members with points or other program currency they earn on qualified stays even if they do not present their TripRewards membership card upon check–in. You will be billed monthly in arrears for qualifying stays by program members during the preceding month.

C.    GDS and Internet Booking Fees

We will charge you under our Central Commission Payment Program either a GDS Fee or an Internet Booking Fee for reservations processed through the global distribution systems ("GDS"), including any operated by an affiliate, or the Internet for your Facility. The GDS Fee described in Section 7 is $4.50 per reservation processed through any GDS or through any Internet website powered by a GDS. Internet-originated reservations carry fees of $3.50 per reservation booked through sources other than GDS powered websites or our Chain website. GDS and Internet-originated reservations may also carry a commission if the originator qualifies. If a guest cancels a GDS or Internet-originated reservation using the same source as was used to originate the reservation, you will not be charged the applicable fee.

D.    Additional Reservation System Charges

Agency and other commissions are typically 10% of the Gross Room Revenues generated by each reservation booked by an agency or other qualifying originator. We may raise the agency commission to up to 15% of Gross Room Revenues from time to time for certain Chain-wide promotions upon 20 days advance written notice. Such increases will apply only to reservations booked after we announce the increased commission unless we specify otherwise. The general sales agent commission (also known as the international sales office commission) is 15% of the

33

7

Gross Room Revenues generated by each reservation originated in an area served by a general sales agent/international sales office and includes the agency commission.

We may assess you for additional fees or commissions charged us by distribution channels, travel intermediaries and retailers or for performing other services. By accepting reservations from the GDS, Internet, travel agencies and other intermediaries, you agree to participate in our Central Commission Payment Program and to reimburse us for any fees or commissions we pay to them on your behalf.

If we suspend Central Reservation System service because of your default under this Agreement, then you must pay us a Service Interruption Fee of $200 before we restore service.

You must (i) make available through the Central Reservation System and the Chain website room rates equivalent to those offered to the general public by third parties that you authorize to offer and sell reservations for the Facility's guest rooms and (ii) participate in the Chain's Best Available Rate Guarantee Program according to its published requirements. Beginning May 1, 2004 if a guest finds a lower publicly available rate on the Internet than the "Best Available Rate" you offer through the Chain website or the Central Reservation System for the same date and accommodations and the guest meets all Program requirements, you must provide the first room night to the guest without a room charge. You may collect standard incidental fees, charges and taxes. We will also charge you a Processing Fee of $25 to reimburse us for our administrative charges of handling the complaint.

We will offer you the opportunity to participate in certain Internet distribution channel marketing and reservation activity with third parties including our affiliates. Under one type of arrangement, you will offer rooms for sale through an electronic distribution channel on which you will be paid a net, non-commissionable rate if and when the rooms are sold by the distribution channel at its marked-up rate. For providing and managing this activity we may receive commissions from the Internet distribution channels based upon the mark-up or room rates that they receive for renting your rooms. The net rate you receive, not the mark-up retained by the channel, should be included in Gross Room Revenues. We will allocate these commissions to Royalties and Basic Service Charges in equal proportions. Under another type of arrangement, you will offer rooms for sale through an electronic distribution channel at your best commissionable rate. The distribution channel will not mark-up these rates but will charge you a commission of up to 15% on consumed room nights.

The "property to property" incentive sales commission is 5% of the Gross Room Revenues generated from each reservation originated by another Chain Facility through the Central Reservation System. You will receive an incentive commission equal to 5% of the Gross Room Revenues generated by a reservation originated through the Facility's Reservation System terminal. We may establish rules and procedures for this program in the Manuals. Your incentive commissions are payable monthly in arrears. We may use your incentive commission payments to offset amounts you owe us for Recurring Fees and other charges, or owe our Affiliates for other fees and charges.

We or an affiliate may charge you a commission of up to 10% of the Gross Room Revenues

34

DAYEXC1
166050 8/04

generated from consumed reservations booked by members of affinity groups and organizations participating in our Member Benefits sales program. We or our affiliate usually pays a portion of this commission to the affinity group or organization in exchange for promoting the Member Benefits program to its members.

E.    Guest Services Assessment

We will contact you if we receive any guest complaint about you or the Facility, and you will be responsible for resolving the complaint to the satisfaction of the guest. If you do not respond to any complaint within 7 business days after we refer it to you and the guest contacts us again to seek resolution, we will charge you a "Guest Services Assessment" of $75.00, plus the costs we incur to settle the matter with the guest. In addition, if the number of guest complaints per 1,000 occupied roomnights about you or the Facility in a calendar year exceed the "Annual Facility Allotment" we establish with the approval of the Board of Directors of the Days Inn Franchise Advisory Association, Inc., we will charge you a "Processing Fee" of $25.00 for each additional complaint we receive during that year, regardless of whether you are able to resolve it to the guest's satisfaction. We may change or eliminate the Guest Services Assessment, the Processing Fee, the Annual Facility Allotment and/or the time for responding to or resolving a guest complaint on a Chain-wide basis at any time upon 30 days advance notice, with the approval of the Board. The Guest Services Assessment and the Processing Fee are intended only to reimburse us for the costs of complaint handling and are not intended as penalties or liquidated damages. All guest complaints remain subject to indemnification under this Agreement.

DAYEXCI
166050 8/04

## GUARANTY

To induce Days Inns Worldwide, Inc., its successors and assigns ("you") to sign the License Agreement (the "Agreement") with the party named as the "Licensee," to which this Guaranty is attached, the undersigned, jointly and severally ("we, "our" or "us"), irrevocably and unconditionally (i) warrant to you that Licensee's representations and warranties in the Agreement are true and correct as stated, and (ii) guaranty that Licensee's obligations under the Agreement, including any amendments, will be punctually paid and performed.

Upon default by Licensee and notice from you we will immediately make each payment and perform or cause Licensee to perform, each unpaid or unperformed obligation of Licensee under the Agreement. Without affecting our obligations under this Guaranty, you may without notice to us extend, modify or release any indebtedness or obligation of Licensee, or settle, adjust or compromise any claims against Licensee. We waive notice of amendment of the Agreement. We acknowledge that Section 17 of the Agreement, including Remedies, Venue and Dispute Resolution, and WAIVER OF JURY TRIAL, applies to this Guaranty.

Upon the death of an individual guarantor, the estate of the guarantor will be bound by this Guaranty for obligations of Licensee to you existing at the time of death, and the obligations of all other guarantors will continue in full force and effect.

IN WITNESS WHEREOF, each of us has signed this Guaranty effective as of the date of the Agreement.

WITNESSES:

GUARANTOR:

Jayesh Patel

36

DAVEXCI
166050 8/04

# EXHIBIT B



Wyndham Hotel Group
Franchise Administration
1 Sylvan Way
Parsippany, NJ 07054
973.753.6000 Phone
800.880.9445 Fax

October 7, 2008

Mr. Jayesh Patel
Naidip Hospitality, LLC
2522 N. Dale Mabry Highway
Tampa, FL 33607

RE:    LETTER AMENDMENT – CHANGE TO EFFECTIVE DATE OF
       LICENSE/FRANCHISE AGREEMENT – DAYS INN
       LOCATED AT 2522 N. Dale Mabry Highway,Tampa, FL 33607 - SITE #06875-
80385-99

Dear Mr. Patel:

This letter is being sent to inform you of the change to the Effective Date of your
License/Franchise Agreement.

You previously signed a Temporary Operator's Agreement ("TOA") with us dated
February 14, 2005 expiring on September 30, 2005.  You then signed a long term
license/franchise agreement with us which was mistakenly dated February 14, 2005, the
same date of the TOA.  The long term agreement should have been dated on the date
following the expiration of the TOA.  The long term agreement has been internally
corrected to reflect the correct Effective Date.  This will confirm that your Temporary
Operator's Agreement expired on August 29, 2005 and the long term agreement
commenced on August 30, 2005 and shall expire on August 31, 2020.

This requires no further action from you, but should you have any questions or concerns
please feel free to contact me directly at 973-753-7218.

Sincerely,

Jeanine Mahan
Director of Contracts
Franchise Administration

cc: file














UPS CampusShip: Label/Receipt



## Shipment Receipt

(Keep this for your records.)

Transaction Date 08 Oct 2008

### Address Information

**Ship To:**
Naidip Hospitality, LLC
Jayesh Patel
813-877-6181
2522 N. Dale Mabry Highway
TAMPA FL 33607-2409

**Shipper:**
Wyndham Hotel Group - 1 Sylvan
Gerri Lyon
(973) 753-7211
1 Sylvan Way
Parsippany NJ 07054

### Shipment Information

**Service:**  UPS 2nd Day Air
*Guaranteed By:  End of Day, Fri. 10 Oct. 2008

| | |
|---|---|
| Fuel Surcharge: | **2.77 |
| Shipping: | **10.25 |

### Package Information

**Package 1 of 1**
Tracking Number:   1Z22445X0294561624
Package Type:      UPS Letter
Actual Weight:     Letter
Billable Weight:   Letter
Reference # 1:     006-5069

### Billing Information

Bill Shipping Charges to:          Shipper's Account 22445X

Total:          All Shipping Charges in USD          **13.02

**Note:** Your invoice may vary from the displayed reference rates.

* For delivery and guarantee information, see the UPS Service Guide. To speak to a customer service representative, call 1-800-PICK-UPS for domestic services and 1-800-782-7892 for international services.

** Detailed information on fuel surcharges is also available.

**Responsibility for Loss or Damage**
Unless a greater value is recorded in the declared value field as appropriate for the UPS shipping system used, the shipper agrees that the released value of each package covered by this receipt is no greater than $100, which is a reasonable value under the circumstances surrounding the transportation. If additional protection is desired, a shipper may increase UPS's limit of liability by declaring a higher value and paying an additional charge. UPS does not accept for transportation and shipper's requesting service through the Internet are prohibited from shipping packages with a value of more than $50,000. The maximum liability per package assumed by UPS shall not exceed $50,000, regardless of value in excess of the maximum. Claims not made within nine months after delivery of the package (sixty days for international shipments), or in the case of failure to make delivery, nine months after a reasonable time for delivery has elapsed (sixty days for international shipments), shall be deemed waived. The entry of a C.O.D. amount is not a declaration of value for carriage purposes. All checks or other negotiable instruments tendered in payment of C.O.D. will be accepted by UPS at shipper's risk. UPS shall not be liable for any special, incidental, or consequential damages. All shipments are subject to the terms and conditions contained in the UPS Tariff and the UPS Terms and Conditions of Service, which can be found at www.ups.com.

# EXHIBIT C

**Location:** Tampa, FL
**Site:** 6875

## SATELLITE CONNECTIVITY SERVICES ADDENDUM

This Satellite Connectivity Services Addendum (the "Addendum") by and between DAYS INNS WORLDWIDE, INC. ("we," "our," "us") and NAIDIP HOSPITALITY-I, LLC ("you," "your") is dated Feb. 14       , 2005 (the "Addendum Effective Date"). This Addendum is part of the License Agreement (the "Agreement") between you and us.

Notwithstanding anything to the contrary set forth in the Agreement, the following provisions shall supercede and apply:

1. Services. Our affiliate has entered into an agreement with Hughes Network Systems, Inc. ("HNS") under which we are authorized to provide our licensees with satellite-based Internet connectivity services. The specific satellite communications services ("Services") and related equipment necessary for the proper functioning of the Services ("Equipment") are listed in Schedule 1 of this Addendum. We will furnish to you the Services and Equipment (collectively, the "VSAT System") for the Facility. Once installed, you will access the Central Reservation System, the Central Data Warehouse, the Email Network and the Brand Information Source (as those terms are defined in the Software and Services Agreement) using only the VSAT System, except in emergencies, while this Addendum remains in effect.

2. Site Inspection. You will reasonably cooperate with us and HNS to determine how the Equipment will be installed. You will furnish us or HNS with any information requested in order to complete the installation. We or HNS, in our sole discretion, will determine the placement of the Equipment at the Facility, which is intended to ensure the optimal performance of the Services.

3. Installation. HNS will install the Equipment at the Facility during regular business hours, when possible. HNS may install, at its sole discretion, anti-icing equipment to protect the Equipment at the Facility at no additional cost to you. If anti-icing equipment is installed, you must provide, at your expense and prior to the installation date, a source of 110V GFCI 20-amp non-dedicated circuit AC power that is readily available at the antenna site. If your installation involves more than two access devices, or additional Equipment, cabling or costs beyond the standard installation package, we may charge you for the charges we incur with HNS to complete installation of the VSAT System, plus an administrative charge of nor more than $50.00. You will allow installation personnel reasonable access to all areas of the Facility necessary to perform the installation. You will obtain in advance, if necessary, any required permits, approvals or consents from any governmental authority, your landlord or mortgagee to install the Equipment at the Facility, including access to the premises of a third-party, if necessary, to complete the installation. You will permit the installation of certain Equipment on the roof or attached to the exterior walls of the Facility. You will furnish to the installation personnel, free of charge, adequate electrical power, local telephone service, water and other utilities necessary to perform the installation. If (a) you postpone a scheduled installation with less than seven (7)

1

days prior written notice to us, or (b) an installation is delayed or aborted because you did not comply with this Section 3 (collectively, a "Cancellation"), you will pay us an Installation Cancellation Charge of $1,000.00 within five (5) days after our written notice to you. If a second Cancellation occurs, you will be in default under this Addendum. You must then cure this default within thirty (30) days after you receive written notice from us. Toll-free access to the Central Reservation System will be unavailable to you while you are in default under this Addendum. We will provide and will reprogram your property management system or property terminal unit to dial a working telephone number for Central Reservation System access, which may cause you to incur toll charges.

4. Operations; Authorizations. (a) Once installed, you will not move the Equipment without our prior written consent. You will maintain the Equipment according to the environmental conditions we specify. Upon reasonable prior notice, you will give us or HNS reasonable access to inspect the Equipment.

(b) You will maintain, at your expense, any necessary permits and licenses required for your use of the VSAT System.

(c) After the Start Date, we will provide through HNS the Services during the Term so long as you are not in default under this Addendum or the Agreement.

5. Support and Maintenance. After the Equipment is installed and Service commences, we will provide you a toll-free number for reporting VSAT System problems. You will contact the number promptly when and if you experience any problems with the VSAT System, or if any casualty affects the VSAT System. We or HNS will work with you to determine if the problem requires support or maintenance services. The support and maintenance services we or HNS will provide you are listed in Schedule 2 to this Addendum. You will allow maintenance personnel reasonable access to all areas of the Facility necessary to perform these services.

6. Monthly Charges. You will pay to us for the VSAT System a Monthly Service Charge of $150.00 for the period (the "Install Period") beginning on the Start Date and ending at the end of 60 full months after the Start Date, or such lesser amount as we determine to charge all similarly situated licensees in our sole discretion for any subsequent period of time and so notify you in writing. The "Start Date" is the date the Equipment has been installed at the Facility and the VSAT System begins operating. Charges will begin to accrue on the Start Date. We will invoice you for the Monthly Service Charge in advance each month. We will charge you a pro-rated amount of the Monthly Service Charge for the portion of a calendar month in which the Start Date occurs if it is not the first day of the month. You will pay the invoice amount to us upon receipt. You will also pay any excise, sales, use or other taxes assessed in connection with the VSAT System. We may apply any amounts received to any outstanding invoices in any order. We may, after we give you at least 30 days advance written notice, increase the Monthly Service Charge during the term of this Addendum by an amount that reflects the actual price increase to us in the rates HNS charges us for the VSAT System and the cost of providing any related support or maintenance services. If we increase your Monthly Service Charge, we will also apply these increases to all other similarly situated Chain Licensees.

2

DAYEXCI
166050 8/04

7. Term. This Addendum will be effective from the date of execution by you and us and shall continue in full force and effect for a period (the "Initial Term") ending on the last day of the sixtieth (60th) month, starting on the first day of the month following the Start Date (the Term Start Date"), unless earlier terminated in accordance with the terms of this Addendum or the Agreement. At the end of the Initial Term, this Addendum shall renew (a "Renewal Term") on a quarterly basis until either you or we give written notice of termination to the other party at least ninety (90) days before the end of the Initial Term or any subsequent Renewal Term.

8. Software. (a) We assign to you HNS' non-exclusive licenses to use the operating systems in connection with the VSAT System (the "Software"), subject to the conditions and limitations in this Addendum. The Software licenses are found on the packaging of the Equipment. The Software may be used only in conjunction with the VSAT System at the Facility, at no other location, and for the sole purpose of obtaining the Services in connection with the operation of your franchise with us. You may not disclose, reverse engineer, alter, add to, modify or copy the Software for any reason. You may not, directly or indirectly, distribute, sell, assign, transfer, offer, disclose, lease or license the Software to a third party.

(b) Title to and ownership of the Software shall remain with us or those entities that have authorized us to sublicense and use them, free of any claim or right of yours or the holder of any security interest, lien or encumbrance on the Facility or any of your other property. If any person attempts to establish any legal right in the Software, you will promptly notify us in writing.

9. Title to Equipment; Risk of Loss; Insurance. HNS or its designee retains title to the Equipment. You have no right, title, or interest in the Equipment other than as specified in this Addendum. The Equipment is not intended to be a fixture or permanently attached to any real property. You will not allow any security interest, landlord's lien, or any other lien or encumbrance to be placed on or attach to the Equipment. If any person attempts to establish any legal right in or to the Equipment, you will promptly notify us in writing. We or HNS may, at our option, mark, label or otherwise identify the Equipment. You will not remove or deface such identification. You bear the entire risk of loss, theft, damage or destruction of any installed Equipment from any cause whatsoever, unless we or HNS directly caused the loss, damage or destruction. You will promptly notify us if the Equipment is damaged for any reason. You will maintain "all-risk" fire and extended casualty (including any acts of nature such as lightning, wind, rain, snow, flood, fire and hail) insurance for the Equipment during the Initial Term and any Renewal Term of at least $25,000, and you name us, Cendant Corporation, Cendant Finance Holding Corporation, their successors and assigns as additional insureds. You will furnish us, prior to installation of the VSAT System, with a certificate of insurance showing the insurance coverage is in effect, the named insured and additional insureds. You must furnish us with an updated certificate of insurance each year when renewed and every time a change is made in your insurance policy or insurance carrier.

10. Force Majeure. If performance by you, HNS or us is delayed or prevented because of strikes, inability to procure labor or materials, defaults of suppliers or subcontractors, delays or shortages of transportation, failure of power or telephone transmissions, restrictive governmental

DAYEXCl
166050 8/04

laws or regulations, weather conditions, or other reasons beyond the reasonable control of the party, then performance of such acts will be excused and the period for performance will be extended for a period equivalent to the period of such delay. Delays or failures to pay resulting from lack of funds will not be deemed delays beyond your reasonable control.

11. No Warranties; Security; Indemnity. (a) WE MAKE NO WARRANTY WHATSOEVER, EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY ABOUT THE VSAT SYSTEM, ITS MERCHANTABILITY, ITS FITNESS FOR ANY PARTICULAR PURPOSE, OR ITS CONFORMANCE TO SPECIFICATIONS OF ANY ORDER OR DOCUMENTATION.

(b) We do not warrant any connection to or transmission over the VSAT System, other than as specified in this Addendum. Your use of any information obtained through the Services is at your own risk. We deny any responsibility for the accuracy or quality of the information obtained through the Services. We do not warrant that the VSAT System will be operate uninterrupted or error-free.

(c) You may not use the VSAT System to take any actions or make any statements that (i) infringe on another party's copyright, patent, trademark, trade secret or other proprietary rights or rights of publicity or privacy; (ii) violate any applicable law, statute, ordinance or regulation; (iii) are defamatory, trade libelous or threatening; (iv) are pornographic or obscene; (v) violate any laws regarding unfair competition, discrimination or false advertising; (vi) result in the distribution of viruses, Trojan horses, worms, time bombs, cancelbots, chain letters or other similar harmful or deleterious programming routines; or (vii) result in the unauthorized entry to any other network, machine or device accessible through the Services. You are responsible for all content transmitted from the VSAT System using the Services.

(d) You are responsible for user access security for the VSAT System; and any unauthorized use of the VSAT System. You must authorize and supervise the users of the VSAT System. We may not provide user access security. However, we and HNS will use reasonable efforts to assist you with detecting and identifying a possible security breach.

(e) We or HNS may, at our sole discretion, institute security controls on the Services to protect the confidentiality, privacy, integrity and availability of your information and our information. These controls include (i) requiring users to utilize unique identification and authorization; (ii) limiting certain levels of access to persons you authorize; (iii) implementing access controls on all data, software or other file-system objects to limit access to only authorized users; (iv) ensuring the integrity of all data stored or processed; and (v) preventing the loss of data processed or transferred.

(f) You acknowledge that the VSAT System is specifically authorized for the Facility's commercial use only, and is not intended for personal Internet use by your personnel or Chain guests. We or HNS may, at our sole discretion, institute filters, screens, traps or other devices on the Services and block certain Internet content from being received at or transmitted from the Facility.

4

(g)  You will indemnify and hold harmless us, our affiliates, successors and assigns and each of the respective directors, officers and employees associated with them against all claims of employees, agents, guests, and all other persons and entities, arising out of your operation, use or non-use of the VSAT System, including any content disseminated from the VSAT System at the Facility.  We will not be liable to you or any other person or entity for personal injury, personal loss or property loss, including but not limited to, damage to the Facility, as a result of your operation, use or non-use of the Services and Equipment.

12.  Temporary Internet Service.  If installation of the VSAT System at the Facility is delayed when your Facility opens as a Chain Facility, you must subscribe, on a temporary basis, to the Internet access service we designate if it offers a local point of presence where the Facility is located.  However, in certain locations you may be obligated to pay additional Internet access charges if your usage exceeds certain specified limits.  If our designated supplier does not offer service in your area, you must subscribe to another Internet service provider, at your cost, until local Internet access service is available from our designated supplier so you can access our information sources available to licensees over the Internet.  You will be responsible for all charges for local access and long distance telecommunications, except the direct charges of any toll-free service we offer.

13.  Default; Termination; Attorney's Fees.  (a) If you are in default under Section 11.1 of the Agreement, or any one of the events described in Section 11.2 of the Agreement that gives us the right to terminate occurs, or you violate Section 11(c) of this Addendum, or you violate Section 8 of the Addendum, or you are in default under either Sections 2 or 3 of the Addendum, or the Equipment becomes inoperable by your act or omission, or you assign or transfer, or attempt to assign or transfer the Services or Equipment without our consent, except as permitted under the Agreement, then to the extent permitted by applicable law, we shall have the right to suspend the Service and use of the Equipment, while the default remains uncured.  Additionally, if you default under this Addendum and do not cure the default within the time permitted, we may, at our option, terminate only this Addendum and not the Agreement, upon written notice to you.

(b)  Upon the termination of this Addendum for any reason, you will permit us or HNS reasonable access to Facility to remove the Equipment. YOU EXPRESSLY WAIVE ANY RIGHT TO NOTICE OF OR A HEARING WITH RESPECT TO REPOSSESSION AND CONSENT TO ENTRY INTO THE FACILITY BY US, HNS OUR OR THEIR AGENTS OR REPRESENTATIVES TO REMOVE THE EQUIPMENT WITHOUT JUDICIAL PROCESS. If you fail or refuse to permit the peaceable entry to take possession of any Equipment, you will be liable for rental of the Equipment at the rate of Five Hundred Dollars ($500.00) per week from the date that we first attempt to retake it.

(c)  If we terminate this Addendum under Section 13(a), you will pay us "Addendum Liquidated Damages" of One Thousand Dollars ($1,000.00) within 10 days following the date of termination. Addendum Liquidated Damages are paid in place of our claims for lost future Monthly Service Charges under this Addendum and the costs to de-install the Equipment.  You and we acknowledge that actual damages are difficult or impossible to ascertain on the

5

Addendum Effective Date, and the amount of the Addendum Liquidated Damages is a reasonable pre-estimate of the damages that will be incurred and is not a penalty. Our right to receive other amounts due under the Agreement and this Addendum is not affected.

(d)   The non-prevailing party will pay the costs and expenses, including reasonable attorneys' fees and the expenses, incurred by the prevailing party to enforce this Addendum.

DAYEXCI
166050 8/04

IN WITNESS WHEREOF, the undersigned have executed this Addendum as of the date set forth above.

**WE:**
**DAYS INNS WORLDWIDE, INC.**

By: _____
          Richard M. Saltzman
          (Vice) President
          Franchise Administration

**YOU**, as licensee:
**NAIDIP HOSPITALITY-I, LLC**

By: _____

Print Name: _____
Managing Member

7

## SCHEDULE 1
## SERVICES AND EQUIPMENT

The Services are full duplex point-to-multipoint satellite communications between an HNS shared hub (the "Hub") and the Facility. The Services include the following:

1) Provision and operation of the Hub by HNS on a 24 hour per day, 365 day per year basis.

2) Built-in redundancy to ensure a higher level of Service availability in the event of HNS equipment failure.

3) Installation of the Equipment at the Facility.

4) Provision and operation of the space segment of HNS's satellite, including its satellite transponder capacity.

5) Equipment maintenance services specified in Schedule 2 of this Addendum.

The Equipment consists of :

1) DW4010 outdoor satellite antenna, indoor equipment with two ethernet ports, two serial (RS-232) ports, and integrated 40 gigabyte hard drive and caching software license.

2) Ethernet Hub (8 port), including up to 25' of ethernet cabling and connections per device for up to 2 separate devices

3) Anti-icing equipment, where required.

8

DAYEXCI
166050 8/04

## SCHEDULE 2
## SUPPORT AND MAINTENANCE

You will receive the following maintenance and support services:

1) Telephone Support. You may contact HNS' satellite control center 24 hours per day, 365 days per year by calling a toll free telephone access to receive Service support.

2) Corrective Maintenance. If HNS determines that the Equipment is not operating properly, HNS will restore the Equipment to good working condition by performing the following corrective maintenance as required:

    a) Diagnostic testing to determine the existence and cause of the malfunction;
    b) Removal and replacement of any malfunctioning field replaceable Equipment ;
    c) Reorientation (repointing) of the antenna subsystem;
    d) Repair or replacement of Equipment interconnecting cables;
    e) Reloading initializing instructions and recommissioning;
    f) Verification of proper operation and completion of service report; and
    g) Notification to the you, us and the control center that the Equipment has been restored to operational status.

3) Limitations. Maintenance services do not include any of the following services:

    a) Maintenance, repair, or replacement of parts damaged or lost through catastrophe, accident, lightning, theft, misuse, fault, or negligence of the you or causes external to the Equipment, including failure of, or faulty, electrical power or air conditioning, operator error, failure, or malfunction of data communication we or HNS did not provide you, or from any cause other than intended and ordinary use.

    b) Changes, modifications, or alterations in or to the Equipment by anyone other than HNS or us other than HNS-approved upgrades and configuration changes

    c) Deinstallation, relocation, or removal of the Equipment or any accessories, attachments, or other devices

4) Software Maintenance. HNS will correct reported defects in the Software that cause it not to substantially perform in accordance with its applicable specifications as promptly as commercially reasonable at no cost to Customer.

5) Software Maintenance Service Limitations. We and HNS have no responsibility to correct any defects in any Software that are caused by (i) modification of the Software by any person other than us or HNS; (ii) failure to install an update provided by us or HNS within 60 days after we or HNS provide it to you; (iii) misuse or improper installation by you; or (iv) problems in third-party hardware, software, or networking equipment which is manipulated by, interoperates with, or operates in conjunction with the Software.

9

DAYEXCI
166050 8/04

# EXHIBIT D

## GUARANTY

To induce Days Inns Worldwide, Inc., its successors and assigns ("you") to sign the License Agreement (the "Agreement") with the party named as the "Licensee," to which this Guaranty is attached, the undersigned, jointly and severally ("we, "our" or "us"), irrevocably and unconditionally (i) warrant to you that Licensee's representations and warranties in the Agreement are true and correct as stated, and (ii) guaranty that Licensee's obligations under the Agreement, including any amendments, will be punctually paid and performed.

Upon default by Licensee and notice from you we will immediately make each payment and perform or cause Licensee to perform, each unpaid or unperformed obligation of Licensee under the Agreement. Without affecting our obligations under this Guaranty, you may without notice to us extend, modify or release any indebtedness or obligation of Licensee, or settle, adjust or compromise any claims against Licensee. We waive notice of amendment of the Agreement. We acknowledge that Section 17 of the Agreement, including Remedies, Venue and Dispute Resolution, and WAIVER OF JURY TRIAL, applies to this Guaranty.

Upon the death of an individual guarantor, the estate of the guarantor will be bound by this Guaranty for obligations of Licensee to you existing at the time of death, and the obligations of all other guarantors will continue in full force and effect.

IN WITNESS WHEREOF, each of us has signed this Guaranty effective as of the date of the Agreement.

WITNESSES:                                     GUARANTOR:

_____                        _____
                                                Jayesh Patel

36

DAVEXCI
166050  8/04

# EXHIBIT E



Wyndham Hotel Group
Contracts Administration
22 Sylvan Way
Parsippany, NJ 07054
973 753 6000 Phone
800 880 9445 Fax

March 24, 2011

**VIA 2 DAY DELIVERY METHOD**

Mr. Tejas Patel
Naidip Hospitality-I, LLC
2025 North Dale Mabry Highway
Tampa, FL 33607

**Re:** **NOTICE OF DEFAULT** - License Agreement dated February 14, 2005 (the "Agreement") between Naidip Hospitality-I, LLC ("you" or "you") and Days Inns Worldwide, Inc. ("we", "us", or "our") relating to Days® Unit #6875-80385-9 located in Tampa, FL (the "Facility")

Dear Mr. Patel:

You are in default under the Agreement for your failure to satisfy the required Quality Standards and your failure to meet your financial obligations. We will address each default in turn.

<u>The Quality Assurance Default</u>

The Agreement requires you to maintain the Facility according to System Standards. You will recall that, on April 6, 2010, August 24, 2010 and September 14, 2010, we sent you default notices because of your failure to ensure that the Facility meets our quality assurance standards. The notices required you to cure the default by the time we conducted a re-inspection of the Facility. However, you did not cure your default within the time permitted as evidenced by the re-inspection score of 748-F on January 27, 2011.

Your failure to cure your default within the time permitted also allows us to terminate the Agreement (including your License to operate the Facility as a Days facility) immediately upon written notice to you. We would prefer, however, to keep our affiliation with you. We will re-inspect the Facility on or after April 24, 2011. Please be advised that you will be billed a re-inspection fee for the re-inspection of the Facility. If the Facility does not receive a quality assurance score of 400 or less, pass the Food & Beverage segment of the re-inspection, and pass the Housekeeping segment of the re-inspection, the Agreement will remain subject to termination. Please understand that we are not waiving this default or any other default under the Agreement by extending your cure period.













Mr. Tejas Patel
March 24, 2011
Page 2

The Financial Default

The default arises from your failure to meet your financial obligations under the Agreement. Our Financial Services Department advises us that as of March 22, 2011 your account is past due in the amount of $155,933.42. We have enclosed an itemized statement detailing the fees past due. Under the Agreement, you have 30 days to pay this amount to us in order to cure your default. If you do not pay this amount within the time permitted, we reserve all rights under the terms of the Agreement including but not limited to termination of the Agreement and your right to operate in the Days Inn System.

This Notice does not modify, replace, or affect any default under the Agreement, or any other default and termination notices, if any, from us or any of our affiliates regarding the Facility. Also, please be advised that we have suspended the Facility's access to our central reservation system due to your defaults.

We hope you will take this opportunity to resolve your defaults. If you have any questions regarding your defaults or how they can be timely cured, please contact Operations Support Desk at (800) 443-3009.

Sincerely yours,

Suzanne Fenimore
Director
Contracts Compliance, Legal

Enclosure

cc:     Clyde Guinn
        Sanjeev Raut
        Mona Christian
        Valerie Capers Workman

Report Date : 22-MAR-11

ITEMIZED STATEMENT
-------------------

As of Date (DD-MMM-YYYY): 22-MAR-2011
Customer No            :  06875-80385-09-DAY
Category Set           :
Category Group         :
Group No               :
Bankruptcy             :  No Bankruptcy Sites
Disputed               :  No
Finance Charges Included:  Yes

Page 1 of 8

Report Date : 22-MAR-11

ITEMIZED STATEMENT
-------------------

Customer No :  06875-80385-09-DAY
Address :      2522 N. DALE MABRY HWY.,TAMPA,FL,33607-2409,US
As of Date:    22-MAR-2011

| Mon-Year | Invoice No | Invoice Date | Description | Accrued | Billing | Amount Tax | FinanceCharges | Total |
|----------|-----------|--------------|-------------|---------|---------|------------|----------------|-------|
| JAN-2010 | 41277659 | 31-JAN-10 | Actual-1000A-RO | | 3338.64 | 0.00 | 201.99 | 3540.63 |
| | 41279025 | 31-JAN-10 | Actual-1210A-MA | | 1001.59 | 0.00 | 60.58 | 1062.17 |
| | | | | Sub Total | 4340.23 | 0.00 | 262.57 | 4602.80 |
| FEB-2010 | 30398532 | 05-FEB-10 | CRS REACTIVATIO | | 200.00 | 0.00 | 12.10 | 212.10 |

https://oracle.wyndhamworldwide.com:8005/OA_CGI/FNDWRR.exe?temp_id=427357554

3/22/2011

Page 2 of 10

| | | | | | | |
|---|---|---|---|---|---|---|
| 21127288 | 22-FEB-10 | WYNREWARDS 5% | 771.73 | 0.00 | 34.73 | 806.46 |
| 24001497 | 22-FEB-10 | RES CENTRAL(CAL | 50.00 | 0.00 | 2.26 | 52.26 |
| 21129384 | 22-FEB-10 | WYNREWARDS CRDT | (79.52) | 0.00 | 0.00 | (79.52) |
| 41306902 | 28-FEB-10 | Actual-1210A-MA | 1588.39 | 0.00 | 264.48 | 1852.87 |
| 41306721 | 28-FEB-10 | Actual-1000A-RO | 5294.64 | 0.00 | 596.21 | 5890.85 |
| 41307545 | 28-FEB-10 | Actual-1800A-RE | 2435.53 | 0.00 | 405.51 | 2841.04 |
| 41287842 | 28-FEB-10 | 5066A-DIRECWAY | 80.40 | 5.63 | 3.87 | 89.90 |
| 41289606 | 28-FEB-10 | 5032A-MSI SOFTW | 464.88 | 32.54 | 22.38 | 519.80 |
| 41290351 | 28-FEB-10 | 5530A-INTRFACE | 137.50 | 9.63 | 6.62 | 153.75 |

Sub Total  10943.55    47.80    1348.16   12339.51

| | | | | | | |
|---|---|---|---|---|---|---|
| MAR-2010 1112607 | 03-MAR-10 | GDS & INTERNET | 5.35 | 0.00 | 0.87 | 6.22 |
| TA0112607 | 03-MAR-10 | T/A COMMISSIONS | 14.62 | 0.00 | 2.45 | 17.07 |
| 24001611 | 22-MAR-10 | RES CENTRAL(CAL | 50.00 | 0.00 | 7.60 | 57.60 |
| 21130885 | 22-MAR-10 | WYNREWARDS 5% | 1113.86 | 0.00 | 168.73 | 1282.59 |
| 1119576 | 29-MAR-10 | GDS & INTERNET | 112.05 | 0.00 | 16.99 | 129.04 |
| TA0119576 | 29-MAR-10 | T/A COMMISSIONS | 46.28 | 0.00 | 7.01 | 53.29 |
| TR0119576 | 29-MAR-10 | TMC / CONSORTIA | 4.47 | 0.00 | 0.69 | 5.16 |
| TM0119576 | 29-MAR-10 | MEMBER BENEFIT | 11.04 | 0.00 | 1.68 | 12.72 |
| 41338196 | 31-MAR-10 | Actual-1800A-RE | 4035.33 | 0.00 | 611.36 | 4646.69 |
| 41336948 | 31-MAR-10 | Actual-1000A-RO | 8772.45 | 0.00 | 1329.02 | 10101.47 |
| 41337722 | 31-MAR-10 | Actual-1210A-MA | 2631.74 | 0.00 | 398.71 | 3030.45 |
| 41316829 | 31-MAR-10 | 5032A-MSI SOFTW | 464.88 | 32.54 | 75.35 | 572.77 |

Sub Total  17262.07    32.54    2620.46   19915.07

Page 2 of 8

Report Date : 22-MAR-11

ITEMIZED STATEMENT
----------------- -----

Customer No :    06875-80385-09-DAY
Address :        2522 N. DALE MABRY HWY.,TAMPA,FL,33607-2409,US
As of Date:      22-MAR-2011

Page 3 of 10

| Mon-Year | Invoice No | Invoice Date | Description | Accrued | Billing | Amount Tax | FinanceCharges | Total |
|----------|-----------|--------------|-------------|---------|---------|------------|----------------|-------|
| APR-2010 | 30428264 | 14-APR-10 | ONLINE LRNG LIB | | 50.00 | 0.00 | 7.60 | 57.60 |
| | TM0125238 | 18-APR-10 | MEMBER BENEFIT | | 5.52 | 0.00 | 0.77 | 6.29 |
| | TA0125238 | 18-APR-10 | T/A COMMISSIONS | | 281.69 | 0.00 | 38.33 | 320.02 |
| | TV0125238 | 18-APR-10 | GOVERNMENT FEES | | 7.59 | 0.00 | 1.04 | 8.63 |
| | TR0125238 | 18-APR-10 | TMC / CONSORTIA | | 18.78 | 0.00 | 2.54 | 21.32 |
| | 1125238 | 18-APR-10 | GDS & INTERNET | | 264.60 | 0.00 | 35.98 | 300.58 |
| | 21133673 | 22-APR-10 | WYNREWARDS CRDT | | (129.05) | 0.00 | 0.00 | (129.05) |
| | 24001753 | 22-APR-10 | RES CENTRAL(CAL | | 50.00 | 0.00 | 6.83 | 56.83 |
| | 21134595 | 22-APR-10 | WYNREWARDS 5% | | 1073.77 | 0.00 | 146.02 | 1219.79 |
| | 30434644 | 30-APR-10 | DIRECWAY | | 160.00 | 11.20 | 23.27 | 194.47 |
| | 41354011 | 30-APR-10 | 5032A-MSI SOFTW | | 464.88 | 32.54 | 67.64 | 565.06 |
| | 41381716 | 30-APR-10 | Actual-1000A-RO | | 6199.46 | 0.00 | 843.11 | 7042.57 |
| | 41382876 | 30-APR-10 | Actual-1800A-RE | | 2851.75 | 0.00 | 387.83 | 3239.58 |
| | 41382229 | 30-APR-10 | Actual-1210A-MA | | 1859.84 | 0.00 | 252.96 | 2112.80 |
| | | | | Sub Total | 13158.83 | 43.74 | 1813.92 | 15016.49 |
| MAY-2010 | 10463566 | 20-MAY-10 | GUEST SRVCS TRA | | 100.00 | 0.00 | 12.10 | 112.10 |
| | 10463565 | 20-MAY-10 | GUEST SATISFACT | | 25.00 | 0.00 | 3.05 | 28.05 |
| | 21137799 | 22-MAY-10 | WYNREWARDS CRDT | | (38.92) | 0.00 | 0.00 | (38.92) |
| | 24001994 | 22-MAY-10 | RES CENTRAL(CAL | | 50.00 | 0.00 | 6.07 | 56.07 |
| | 21135950 | 22-MAY-10 | WYNREWARDS 5% | | 1129.02 | 0.00 | 136.63 | 1265.65 |
| | TA0130970 | 23-MAY-10 | T/A COMMISSIONS | | 109.52 | 0.00 | 13.25 | 122.77 |
| | TV0130970 | 23-MAY-10 | GOVERNMENT FEES | | 3.52 | 0.00 | 0.40 | 3.92 |
| | TM0130970 | 23-MAY-10 | MEMBER BENEFIT | | 5.52 | 0.00 | 0.68 | 6.20 |
| | 1130970 | 23-MAY-10 | GDS & INTERNET | | 99.50 | 0.00 | 12.02 | 111.52 |
| | TR0130970 | 23-MAY-10 | TMC / CONSORTIA | | 13.09 | 0.00 | 1.58 | 14.67 |
| | 30443622 | 31-MAY-10 | DIRECWAY | | 160.00 | 11.20 | 20.71 | 191.91 |
| | 30449674 | 31-MAY-10 | CK133083 | | 20.00 | 0.00 | 2.42 | 22.42 |
| | 41411760 | 31-MAY-10 | Actual-1000A-RO | | 5641.40 | 0.00 | 688.03 | 6329.43 |
| | 41408558 | 31-MAY-10 | Actual-1210A-MA | | 1692.42 | 0.00 | 206.40 | 1898.82 |
| | 41398160 | 31-MAY-10 | 5032A-MSI SOFTW | | 464.88 | 32.54 | 60.18 | 557.60 |
| | 41410532 | 31-MAY-10 | Actual-1800A-RE | | 2599.04 | 0.00 | 318.49 | 2917.53 |

https://oracle.wyndhamworldwide.com:8005/OA_CGI/FNDWRR.exe?temp_id=427357554                3/22/2011

Report Date : 22-MAR-11

ITEMIZED STATEMENT
-------------------

Customer No :   06875-80385-09-DAY
Address :       2522 N. DALE MABRY HWY.,TAMPA,FL,33607-2409,US
As of Date:     22-MAR-2011

| Mon-Year | Invoice No | Invoice Date | Description | Accrued | Billing | Amount Tax | FinanceCharges | Total |
|----------|------------|--------------|-------------|---------|---------|------------|----------------|-------|
|          |            |              | Sub Total   |         | 12069.99 | 43.74 | 1480.01 | 13593.74 |
|          |            |              |             |         |         |       |         |          |
| JUN-2010 | 30447522   | 04-JUN-10    | OTA Credit  |         | (8514.02) | 0.00 | 0.00 | (8514.02) |
|          | TA0138492  | 20-JUN-10    | T/A COMMISSIONS |     | 65.48   | 0.00 | 6.89 | 72.37 |
|          | TR0138492  | 20-JUN-10    | TMC / CONSORTIA |     | 8.54    | 0.00 | 0.90 | 9.44 |
|          | 1138492    | 22-JUN-10    | GDS & INTERNET |      | 48.50   | 0.00 | 5.12 | 53.62 |
|          | 24002108   | 22-JUN-10    | RES CENTRAL(CAL |     | 50.00   | 0.00 | 5.29 | 55.29 |
|          | 21139222   | 22-JUN-10    | WYNREWARDS 5% |       | 917.91  | 0.00 | 96.85 | 1014.76 |
|          | 30458176   | 30-JUN-10    | DIRECWAY    |         | 160.00  | 11.20 | 18.06 | 189.26 |
|          | 41441316   | 30-JUN-10    | Actual-1800A-RE |     | 2134.58 | 0.00 | 225.85 | 2360.43 |
|          | 41441488   | 30-JUN-10    | Actual-1210A-MA |     | 1392.12 | 0.00 | 147.30 | 1539.42 |
|          | 41439851   | 30-JUN-10    | Actual-1000A-RO |     | 4640.39 | 0.00 | 490.96 | 5131.35 |
|          | 41431277   | 30-JUN-10    | 5032A-MSI SOFTW |     | 464.88  | 32.54 | 52.47 | 549.89 |
|          |            |              | Sub Total   |         | 1368.38 | 43.74 | 1049.69 | 2461.81 |
|          |            |              |             |         |         |       |         |          |
| JUL-2010 | TA0145220  | 18-JUL-10    | T/A COMMISSIONS |     | 11.70   | 0.00 | 1.05 | 12.75 |
|          | TR0145220  | 18-JUL-10    | TMC / CONSORTIA |     | 2.29    | 0.00 | 0.21 | 2.50 |
|          | TV0145220  | 18-JUL-10    | GOVERNMENT FEES |     | 2.95    | 0.00 | 0.27 | 3.22 |
|          | TM0145220  | 18-JUL-10    | MEMBER BENEFIT |      | 15.80   | 0.00 | 1.41 | 17.21 |
|          | 1145220    | 18-JUL-10    | GDS & INTERNET |      | 31.60   | 0.00 | 2.84 | 34.44 |
|          | 21143402   | 22-JUL-10    | WYNREWARDS CRDT |     | (95.95) | 0.00 | 0.00 | (95.95) |
|          | 21142134   | 22-JUL-10    | WYNREWARDS 5% |       | 138.58  | 0.00 | 12.48 | 151.06 |
|          | 24002407   | 22-JUL-10    | RES CENTRAL(CAL |     | 50.00   | 0.00 | 4.52 | 54.52 |
|          | 30468548   | 29-JUL-10    | PM SYSTEM HW WR |     | 793.10  | 0.00 | 71.37 | 864.47 |
|          | 30468547   | 29-JUL-10    | EQUIP SHIPPING |      | 489.89  | 0.00 | 44.08 | 533.97 |
|          | 30468544   | 29-JUL-10    | Micros Hardware |     | 9813.74 | 686.96 | 945.06 | 11445.76 |

| | | | | | |
|---|---|---|---|---|---|
| 30468546 | 29-JUL-10 | PM SYSTEM TRAIN | 14039.15 | 0.00 | 1263.54 | 15302.69 |
| 41457841 | 31-JUL-10 | 5066A-DIRECWAY | 160.00 | 11.20 | 15.40 | 186.60 |
| 41479127 | 31-JUL-10 | Actual-1000A-RO | 4285.29 | 0.00 | 422.38 | 4707.67 |
| 41480958 | 31-JUL-10 | Actual-1800A-RE | 1971.23 | 0.00 | 194.29 | 2165.52 |
| 41479750 | 31-JUL-10 | Actual-1210A-MA | 1285.59 | 0.00 | 126.72 | 1412.31 |

Page 4 of 8

Report Date : 22-MAR-11

ITEMIZED STATEMENT
------------------

Customer No :   06875-80385-09-DAY
Address :       2522 N. DALE MABRY HWY.,TAMPA,FL,33607-2409,US
As of Date:     22-MAR-2011

| Mon-Year | Invoice No | Invoice Date | Description | Accrued | Billing | Amount Tax | FinanceCharges | Total |
|---|---|---|---|---|---|---|---|---|
| | | | | Sub Total | 32994.96 | 698.16 | 3105.62 | 36798.74 |
| | | | | | | | | |
| AUG-2010 | TA0151562 | 22-AUG-10 | T/A COMMISSIONS | | 17.60 | 0.00 | 1.31 | 18.91 |
| | TG0151562 | 22-AUG-10 | GSA FEES | | 21.36 | 0.00 | 1.60 | 22.96 |
| | 1151562 | 22-AUG-10 | GDS & INTERNET | | 48.75 | 0.00 | 3.66 | 52.41 |
| | 24002491 | 22-AUG-10 | RES CENTRAL(CAL | | 50.00 | 0.00 | 3.76 | 53.76 |
| | TV0151562 | 22-AUG-10 | GOVERNMENT FEES | | 6.16 | 0.00 | 0.47 | 6.63 |
| | 30478034 | 24-AUG-10 | Q/A REINSPECTIO | | 1700.00 | 0.00 | 127.50 | 1827.50 |
| | 41507370 | 31-AUG-10 | Actual-1800A-RE | | 1507.46 | 0.00 | 141.22 | 1648.68 |
| | 41505397 | 31-AUG-10 | Actual-1000A-RO | | 3277.08 | 0.00 | 306.96 | 3584.04 |
| | 41488322 | 31-AUG-10 | 5066A-DIRECWAY | | 160.00 | 11.20 | 12.84 | 184.04 |
| | 41506844 | 31-AUG-10 | Actual-1210A-MA | | 983.12 | 0.00 | 92.10 | 1075.22 |
| | | | | Sub Total | 7771.53 | 11.20 | 691.42 | 8474.15 |

| SEP-2010 | TA0158669 | 19-SEP-10 | T/A COMMISSIONS | 7.12 | 0.00 | 0.42 | 7.54 |
| | 1158669 | 19-SEP-10 | GDS & INTERNET | 29.60 | 0.00 | 1.76 | 31.36 |
| | 24002625 | 22-SEP-10 | RES CENTRAL(CAL | 50.00 | 0.00 | 2.99 | 52.99 |
| | 41525649 | 30-SEP-10 | 5066A-DIRECWAY | 160.00 | 11.20 | 10.18 | 181.38 |
| | 41546303 | 30-SEP-10 | Actual-1800A-RE | 1321.66 | 0.00 | 88.95 | 1410.61 |
| | 41545897 | 30-SEP-10 | Actual-1210A-MA | 861.95 | 0.00 | 58.01 | 919.96 |
| | 41544318 | 30-SEP-10 | Actual-1000A-RO | 2873.17 | 0.00 | 193.34 | 3066.51 |
| | | | Sub Total | 5303.50 | 11.20 | 355.65 | 5670.35 |
| OCT-2010 | TA0165759 | 17-OCT-10 | T/A COMMISSIONS | 44.07 | 0.00 | 1.96 | 46.03 |
| | TR0165759 | 17-OCT-10 | TMC / CONSORTIA | 14.10 | 0.00 | 0.63 | 14.73 |
| | 1165759 | 17-OCT-10 | GDS & INTERNET | 65.55 | 0.00 | 2.92 | 68.47 |
| | 24002898 | 22-OCT-10 | RES CENTRAL(CAL | 50.00 | 0.00 | 2.23 | 52.23 |
| | 21150254 | 22-OCT-10 | WYNREWARDS 5% | 56.08 | 0.00 | 2.50 | 58.58 |
| | 41577221 | 31-OCT-10 | Actual-1000A-RO | 2825.05 | 0.00 | 125.72 | 2950.77 |
| | 30503447 | 31-OCT-10 | HughesNet VSAT | 160.00 | 11.20 | 7.62 | 178.82 |

Page 5 of 8

Report Date : 22-MAR-11

ITEMIZED STATEMENT
--------------------

Customer No :   06875-80385-09-DAY
Address :   2522 N. DALE MABRY HWY.,TAMPA,FL,33607-2409,US
As of Date:   22-MAR-2011

| Mon-Year | Invoice No | Invoice Date | Description | Accrued | Billing | Amount Tax | FinanceCharges | Total |
| --------- | ---------------- | ------------- | --------------------- | ------- | ------------ | ------------ | ------------- | --------- |
| | 41578508 | 31-OCT-10 | Actual-1800A-RE | | 1299.52 | 0.00 | 57.82 | 1357.34 |
| | 41577801 | 31-OCT-10 | Actual-1210A-MA | | 847.52 | 0.00 | 37.72 | 885.24 |
| | | | Sub Total | | 5361.89 | 11.20 | 239.12 | 5612.21 |
| NOV-2010 | 30507835 | 11-NOV-10 | Q/A REINSPECTIO | | 1700.00 | 0.00 | 75.65 | 1775.65 |

Page 7 of 10

| | | | | | | |
|---|---|---|---|---|---|---|
| 10511561 | 17-NOV-10 | GUEST SATISFACT | 40.32 | 0.00 | 1.16 | 41.48 |
| 10511562 | 17-NOV-10 | GUEST SRVCS TRA | 160.00 | 0.00 | 4.64 | 164.64 |
| TR0171101 | 21-NOV-10 | TMC / CONSORTIA | 15.27 | 0.00 | 0.44 | 15.71 |
| TA0171101 | 21-NOV-10 | T/A COMMISSIONS | 43.62 | 0.00 | 1.26 | 44.88 |
| 1171101 | 21-NOV-10 | GDS & INTERNET | 35.20 | 0.00 | 1.02 | 36.22 |
| 24003086 | 22-NOV-10 | RES CENTRAL(CAL | 50.00 | 0.00 | 1.45 | 51.45 |
| 21154873 | 22-NOV-10 | WYNREWARDS 5% | 50.52 | 0.00 | 1.47 | 51.99 |
| 41603946 | 30-NOV-10 | Actual-1800A-RE | 1016.98 | 0.00 | 29.49 | 1046.47 |
| 41597574 | 30-NOV-10 | 5715A-HughesNet | 160.00 | 11.20 | 4.97 | 176.17 |
| 41603063 | 30-NOV-10 | Actual-1210A-MA | 663.25 | 0.00 | 19.24 | 682.49 |
| 41605198 | 30-NOV-10 | Actual-1000A-RO | 2210.83 | 0.00 | 64.11 | 2274.94 |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | Sub Total | 6145.99 | 11.20 | 204.90 | 6362.09 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| DEC-2010 | TR0177768 | 20-DEC-10 | TMC / CONSORTIA | 5.26 | 0.00 | 0.07 | 5.33 |
| | TAC177768 | 20-DEC-10 | T/A COMMISSIONS | 40.13 | 0.00 | 0.54 | 40.67 |
| | 1177768 | 20-DEC-10 | GDS & INTERNET | 36.20 | 0.00 | 0.49 | 36.69 |
| | 10516257 | 22-DEC-10 | GUEST SATISFACT | 35.00 | 0.00 | 0.47 | 35.47 |
| | 10516255 | 22-DEC-10 | GUEST SRVCS TRA | 160.00 | 0.00 | 2.16 | 162.16 |
| | 24003240 | 22-DEC-10 | RES CENTRAL(CAL | 50.00 | 0.00 | 0.68 | 50.68 |
| | 21157624 | 22-DEC-10 | WYNREWARDS 5% | 9.45 | 0.00 | 0.13 | 9.58 |
| | 30526384 | 31-DEC-10 | VSAT MAR-2010 | 160.00 | 11.20 | 3.77 | 174.97 |
| | 41636608 | 31-DEC-10 | Actual-1210A-MA | 863.02 | 0.00 | 11.65 | 874.67 |
| | 41637777 | 31-DEC-10 | Actual-1800A-RE | 1323.29 | 0.00 | 17.86 | 1341.15 |
| | 41638740 | 31-DEC-10 | Actual-1000A-RO | 2876.72 | 0.00 | 38.84 | 2915.56 |
| | 41627731 | 31-DEC-10 | 5715A-HughesNet | 160.00 | 11.20 | 2.31 | 173.51 |

Page 6 of 8

Report Date : 22-MAR-11

ITEMIZED STATEMENT
------------------

Customer No :    06875-80385-09-DAY
Address :        2522 N. DALE MABRY HWY.,TAMPA,FL,33607-2409,US
As of Date:      22-MAR-2011

Case 2:14-cv-00537-JLL-JAD   Document 1   Filed 01/27/14   Page 78 of 97 PageID: 78

Page 8 of 10

| Mon-Year | Invoice No | Invoice Date | Description | Accrued | Billing | Amount Tax | FinanceCharges | Total |
|----------|-----------|-------------|-------------|---------|---------|-----------|----------------|-------|
| | | | | Sub Total | 5719.07 | 22.40 | 78.97 | 5820.44 |
| JAN-2011 | 1184686 | 16-JAN-11 | GDS & INTERNET | | 52.60 | 0.00 | 0.74 | 53.34 |
| | TR0184686 | 16-JAN-11 | TMC / CONSORTIA | | 4.98 | 0.00 | 0.07 | 5.05 |
| | 21159545 | 22-JAN-11 | WYNREWARDS 5% | | 64.28 | 0.00 | 0.71 | 64.99 |
| | 24003473 | 22-JAN-11 | RES CENTRAL(CAL | | 50.00 | 0.00 | 0.55 | 50.55 |
| | 41676097 | 31-JAN-11 | Accrual-1800A-R | * | 1597.95 | 0.00 | 10.39 | 1608.34 |
| | 41678466 | 31-JAN-11 | Accrual-1000A-R | * | 3473.80 | 0.00 | 22.58 | 3496.38 |
| | 41680117 | 31-JAN-11 | Accrual-1210A-M | * | 1042.14 | 0.00 | 6.77 | 1048.91 |
| | 41653483 | 31-JAN-11 | 5715A-HughesNet | | 160.00 | 11.20 | 1.11 | 172.31 |
| | | | | Sub Total | 6445.75 | 11.20 | 42.92 | 6499.87 |
| FEB-2011 | 30534684 | 04-FEB-11 | Q/A REINSPECTIO | | 1700.00 | 0.00 | 7.65 | 1707.65 |
| | 30540816 | 14-FEB-11 | SUMMIT 2011 FEE | | 599.00 | 0.00 | 0.00 | 599.00 |
| | 1190906 | 20-FEB-11 | GDS & INTERNET | | 72.40 | 0.00 | 0.00 | 72.40 |
| | TR0190906 | 20-FEB-11 | TMC / CONSORTIA | | 13.00 | 0.00 | 0.00 | 13.00 |
| | TA0190906 | 20-FEB-11 | T/A COMMISSIONS | | 118.36 | 0.00 | 0.00 | 118.36 |
| | 24003650 | 22-FEB-11 | RES CENTRAL(CAL | | 50.00 | 0.00 | 0.00 | 50.00 |
| | 21161578 | 22-FEB-11 | WYNREWARDS 5% | | 55.83 | 0.00 | 0.00 | 55.83 |
| | 41703701 | 28-FEB-11 | Accrual-1800A-R | * | 2478.78 | 0.00 | 0.00 | 2478.78 |
| | 41689764 | 28-FEB-11 | 5715A-HughesNet | | 160.00 | 11.20 | 0.00 | 171.20 |
| | 41702646 | 28-FEB-11 | Accrual-1000A-R | * | 5388.65 | 0.00 | 0.00 | 5388.65 |
| | 41702241 | 28-FEB-11 | Accrual-1210A-M | * | 1616.60 | 0.00 | 0.00 | 1616.60 |
| | | | | Sub Total | 12252.62 | 11.20 | 7.65 | 12271.47 |
| MAR-2011 | 10527518 | 09-MAR-11 | GUEST SRVCS TRA | | 160.00 | 0.00 | 0.00 | 160.00 |
| | 10527517 | 09-MAR-11 | GUEST SATISFACT | | 75.00 | 0.00 | 0.00 | 75.00 |
| | 10529283 | 17-MAR-11 | GUEST SATISFACT | | 99.68 | 0.00 | 0.00 | 99.68 |
| | 10529229 | 17-MAR-11 | GUEST SRVCS TRA | | 160.00 | 0.00 | 0.00 | 160.00 |

Report Date : 22-MAR-11

ITEMIZED STATEMENT
---------------------

Customer No :   06875-8C385-09-DAY
Address :       2522 N. DALE MABRY HWY.,TAMPA,FL,33607-2409,US
As of Date:     22-MAR-2011

| Mon-Year | Invoice No | Invoice Date | Description | Accrued | Billing | Amount Tax | FinanceCharges | Total |
|----------|-----------|--------------|-------------|---------|---------|-----|----------------|-------|
| | | | | Sub Total | 494.68 | 0.00 | 0.00 | 494.68 |
| | | | | Grand Total | 141633.04 | 999.32 | 13301.06 | 155933.42 |

Requested By: Yelena Danishevsky

* Please note the accrua's on your account are estimates.
  Make sure to promptly submit your actual gross room revenue and rooms sold.

******* END OF REPORT *******

Case 2:14-cv-00537-JLL-JAD   Document 1   Filed 01/27/14   Page 80 of 97 PageID: 80

Page 8 of 8

UPS CampusShip: Shipment Receipt

Page 1 of 1

### Shipment Receipt



Transaction Date:          24 Mar 2011
Tracking Number:        1Z22445X0292813212

**1  Address Information**

| Ship To: | Ship From: | Return Address: |
|---|---|---|
| Naldip Hospitality -1, Llc | Wyndham Hotel Group - 22 Sylvan | Wyndham Hotel Group - 22 Sylvan |
| Tejas Patel | Elena Danishevsky | Elena Danishevsky |
| Days Inn | 22 Sylvan Way | 22 Sylvan Way |
| 2025 N. Dale Mabry Hwy | Parsippany NJ 07054 | Parsippany NJ 07054 |
| TAMPA FL 336072532 | Telephone:973-753-7236 | Telephone:973-753-7236 |
| Telephone: (813) 877-6181 | | |

**2  Package Information**

| | Weight | Dimensions / Packaging | Declared Value | Reference Numbers |
|---|---|---|---|---|
| 1 | Letter | UPS Letter | | Reference # 1 - 006-5072 |

**3  UPS Shipping Service and Shipping Options**

Service:
UPS 2nd Day Air

Guaranteed By: 1
End of Day Monday, 3/28/2011

| Shipping Fees Subtotal: | 14.04 USD |
|---|---|
| Transportation | 12.65 USD |
| Fuel Surcharge | 1.39 USD |

**4  Payment Information**

Bill Shipping Charges to:       Shipper's Account 22445X

Daily rates were applied to this shipment

| Total Charged: | 14.04 USD |
|---|---|

Note: Your invoice may vary from the displayed reference rates.

* For delivery and guarantee information, see the UPS Service Guide. To speak to a customer service representative, call 1-800-PICK-UPS for domestic services and 1-800-782-7892 for international services.

Close Window

# EXHIBIT F



# WYNDHAM

## HOTEL GROUP

Compliance Department
22 Sylvan Way
Parsippany, New Jersey 07054
Ph (973) 753-6000 ● fax (800) 880-9445
www.wyndhamworldwide.com

June 29, 2011

**VIA 2 DAY DELIVERY METHOD**

Mr. Jayesh Patel
Naidip Hospitality-I, LLC
2055 North Dale Mabry
Tampa, FL 33607

RE:   **NOTICE OF TERMINATION** of License Agreement, dated August 30, 2005, (the "Agreement") between Naidip Hospitality–I, LLC ("you" or "your") and Days Inns Worldwide, Inc. ("we", "our" or "us") for the Days® lodging facility located at Tampa, FL / #06875-80385-09 (the "Facility")

Dear Mr. Patel:

We write to give you formal notice of the termination of the License granted under the Agreement to operate the Facility as part of the Days System (the "Notice"). This termination is a result of your failure to cure your default under the Agreement, due to your failure to meet your financial obligations. The termination of your Agreement is effective the date of this letter (the "Termination Date").

Because your License is terminated, you must now perform your post-termination obligations such as removal of all items that display or refer to the Days Inn brand at the Facility. The de-identification procedures are specified in the attachment to this letter. These de-identification procedures must be completed within 10 days after the date of this Notice.

You must also immediately pay us the full amount of all Recurring Fees and other charges due under the Agreement through the date you complete the de-identification process. We estimate that, as of June 29, 2011, you owe us $209,230.17 in Recurring Fees. This amount is described in more detail in the attached itemized statement. Additionally, you must pay us Liquidated Damages of $592,000.00 as specified in the Agreement. You must also pay Liquidated Damages of $1,000.00 for early termination of the Addendum to the Agreement for Satellite Connectivity Services (the "Addendum"). The Addendum has also terminated on the Termination Date.

Please know that, because your License has terminated, you also have lost your right to continue to use the seamless interface version of the Project Power Up property management system. You must now make your own arrangements with the software vendor for a new license, as stated in your Software & Services Agreement.

# WYNDHAM

## HOTEL GROUP

       

       

Mr. Jayesh Patel
June 29, 2011
Page Two

If within the 10 day period described above, you do not timely remove the exterior signage which bears the Days Inn name and marks, we may exercise our rights under the Agreement and send an independent contractor to the Facility to remove all such signage at and around the Facility. The cost of sign removal will be added to your final invoice from us.  If you object to the removal of the signage by our independent contractor, you must notify us within 10 days of the date of this letter.

If you do not timely complete each of these post-termination obligations, we will refer this matter to our legal department to ensure that we recover from you all amounts owed and that all of your post-termination obligations to us are performed.

This Notice does not modify, replace or affect any default under the Agreement, or any other default and termination notices, if any, from us or any of our affiliates regarding the Facility. Please consider this letter to be a notice and demand for payment under any Guaranty of the Agreement, directed to all of your Guarantors.

If you have any questions regarding your obligations under this letter, Larry Geer, Senior Director of Settlements at (973) 753-7131.

Sincerely,

Valerie Capers Workman
Vice President
Compliance & Government Relations

Enclosures

cc:    Colonial Bank (Lender) 400 N. Tampa St., Ste.2500, Tampa FL 33602
       Clyde Guinn
       Larry Geer

Report Date : 29-JUN-11

ITEMIZED STATEMENT
------------------

```
As of Date (DD-MMM-YYYY):   29-JUN-2011
Customer No             :   06875-80385-09-DAY
Category Set            :
Category Group          :
Group No                :
Bankruptcy              :   No Bankruptcy Sites
Disputed                :   No
Finance Charges Included:   Yes
```

Page 1 of 10

Report Date : 29-JUN-11

ITEMIZED STATEMENT
------------------

Customer No :  06875-80385-09-DAY
Address    :  2522 N. DALE MABRY HWY.,TAMPA,FL,33607-2409,US
As of Date:   29-JUN-2011

| Mon-Year | Invoice No | Invoice Date | Description | Accrued | Billing | Amount Tax | FinanceCharges | Total |
|----------|-----------|--------------|-------------|---------|---------|------------|----------------|-------|
| JAN-2010 | 41277659  | 31-JAN-10    | Actual-1000A-RO |     | 3338.64 | 0.00 | 201.99 | 3540.63 |
|          | 41279025  | 31-JAN-10    | Actual-1210A-MA |     | 1001.59 | 0.00 | 60.58  | 1062.17 |
|          |           |              | Sub Total   |         | 4340.23 | 0.00 | 262.57 | 4602.80 |
| FEB-2010 | 30398532  | 05-FEB-10    | CRS REACTIVATIO |     | 200.00  | 0.00 | 12.10  | 212.10 |
|          | 21127288  | 22-FEB-10    | WYNREWARDS 5%   |     | 771.73  | 0.00 | 34.73  | 806.46 |
|          | 24001497  | 22-FEB-10    | RES CENTRAL/CAL |     | 50.00   | 0.00 | 2.26   | 52.26 |
|          | 21129384  | 22-FEB-10    | WYNREWARDS CRDT |     | (79.52) | 0.00 | 0.00   | (79.52) |
|          | 41306902  | 28-FEB-10    | Actual-1210A-MA |     | 1588.39 | 0.00 | 337.55 | 1925.94 |
|          | 41306721  | 28-FEB-10    | Actual-1000A-RO |     | 5294.64 | 0.00 | 709.65 | 6004.29 |
|          | 41307545  | 28-FEB-10    | Actual-1800A-RE |     | 2435.53 | 0.00 | 517.54 | 2953.07 |
|          | 41287842  | 28-FEB-10    | 5066A-DIRECWAY  |     | 80.40   | 5.63 | 3.87   | 89.90 |
|          | 41289606  | 28-FEB-10    | 5032A-MSI SOFTW |     | 464.88  | 32.54 | 22.38 | 519.80 |
|          | 41290351  | 28-FEB-10    | 5530A-INTRFACE  |     | 137.50  | 9.63 | 6.62   | 153.75 |
|          |           |              | Sub Total   |         | 10943.55 | 47.80 | 1646.70 | 12638.05 |
| MAR-2010 | 1112507   | 03-MAR-10    | GDS & INTERNET  |     | 5.35    | 0.00 | 1.11   | 6.46 |
|          | TA0112507 | 03-MAR-10    | T/A COMMISSIONS |     | 14.62   | 0.00 | 3.03   | 17.75 |
|          | 24001611  | 22-MAR-10    | RES CENTRAL/CAL |     | 50.00   | 0.00 | 9.91   | 59.91 |
|          | 21130085  | 22-MAR-10    | WYNREWARDS 5%   |     | 1113.86 | 0.00 | 219.96 | 1333.82 |
|          | 1119570   | 29-MAR-10    | GDS & INTERNET  |     | 112.05  | 0.00 | 22.15  | 134.20 |
|          | TA0119576 | 29-MAR-10    | T/A COMMISSIONS |     | 46.28   | 0.00 | 9.14   | 55.42 |
|          | TR0119576 | 29-MAR-10    | TMC / CONSORTIA |     | 4.47    | 0.00 | 0.90   | 5.37 |
|          | TM0119576 | 29-MAR-10    | MEMBER BENEFIT  |     | 11.04   | 0.00 | 2.19   | 13.23 |
|          | 41338196  | 31-MAR-10    | Actual-1800A-RE |     | 4035.33 | 0.00 | 796.99 | 4832.32 |
|          | 41336948  | 31-MAR-10    | Actual-1000A-RO |     | 8772.45 | 0.00 | 1732.55 | 10505.00 |
|          | 41337722  | 31-MAR-10    | Actual-1210A-MA |     | 2631.74 | 0.00 | 519.77 | 3151.51 |
|          | 41316829  | 31-MAR-10    | 5032A-MSI SOFTW |     | 464.88  | 32.54 | 98.23 | 595.65 |
|          |           |              | Sub Total   |         | 17262.07 | 32.54 | 3416.03 | 20710.64 |

Page 2 of 10

Report Date : 29-JUN-11

ITEMIZED STATEMENT
--------------------

Customer No :  06875-80385-09-DAY
Address :      2522 N. DALE MABRY HWY., TAMPA, FL, 33607-2409, US
As of Date:    29-JUN-2011

| Mon-Year | Invoice No | Invoice Date | Description | Accrued | Billing | Amount Tax | FinanceCharges | Total |
|---|---|---|---|---|---|---|---|---|
| APR-2010 | 30428264 | 14-APR-10 | ONLINE LRNG LIB | | 50.00 | 0.00 | 9.91 | 59.91 |
| | TM0125238 | 18-APR-10 | MEMBER BENEFIT | | 5.52 | 0.00 | 1.03 | 6.55 |
| | TA0125238 | 18-APR-10 | T/A COMMISSIONS | | 281.69 | 0.00 | 51.30 | 332.99 |
| | TV0125238 | 18-APR-10 | GOVERNMENT FEES | | 7.59 | 0.00 | 1.39 | 8.98 |
| | TR0125238 | 18-APR-10 | TMC / CONSORTIA | | 18.78 | 0.00 | 3.40 | 22.18 |
| | 1125238 | 18-APR-10 | GDS & INTERNET | | 264.60 | 0.00 | 48.15 | 312.75 |
| | 21133673 | 22-APR-10 | WYNREWARDS CRDT | | (129.05) | 0.00 | 0.00 | (129.05) |
| | 24001753 | 22-APR-10 | RES CENTRAL/CAL | | 50.00 | 0.00 | 9.14 | 59.14 |
| | 21134696 | 22-APR-10 | WYNREWARDS 5% | | 1073.77 | 0.00 | 195.41 | 1269.18 |
| | 30434644 | 30-APR-10 | DIRECWAY | | 160.00 | 0.00 | 31.14 | 202.34 |
| | 41354811 | 30-APR-10 | 5032A-MSI SOFTW | | 464.88 | 32.54 | 90.52 | 587.94 |
| | 41381716 | 30-APR-10 | Actual-1000A-RO | | 6199.46 | 0.00 | 1128.28 | 7327.74 |
| | 41382876 | 30-APR-10 | Actual-1800A-RE | | 2851.75 | 0.00 | 519.01 | 3370.76 |
| | 41382229 | 30-APR-10 | Actual-1210A-MA | | 1859.84 | 0.00 | 338.52 | 2198.36 |
| | | | | Sub Total | 13158.83 | 43.74 | 2427.20 | 15629.77 |
| MAY-2010 | 10463566 | 20-MAY-10 | GUEST SRVCS TRA | | 100.00 | 0.00 | 16.70 | 116.70 |
| | 10463565 | 20-MAY-10 | GUEST SATISFACT | | 25.00 | 0.00 | 4.21 | 29.21 |
| | 21137799 | 22-MAY-10 | WYNREWARDS CRDT | | (38.92) | 0.00 | 0.00 | (38.92) |
| | 24001994 | 22-MAY-10 | RES CENTRAL/CAL | | 50.00 | 0.00 | 8.38 | 58.38 |
| | 21135950 | 22-MAY-10 | WYNREWARDS 5% | | 1129.02 | 0.00 | 198.57 | 1327.59 |
| | TA0130970 | 23-MAY-10 | T/A COMMISSIONS | | 109.52 | 0.00 | 18.29 | 127.81 |
| | TV0130970 | 23-MAY-10 | GOVERNMENT FEES | | 3.52 | 0.00 | 0.55 | 4.07 |
| | TM0130970 | 23-MAY-10 | MEMBER BENEFIT | | 5.52 | 0.00 | 0.94 | 6.46 |
| | 1130970 | 23-MAY-10 | GDS & INTERNET | | 99.50 | 0.00 | 16.59 | 116.09 |
| | TR0130970 | 23-MAY-10 | TMC / CONSORTIA | | 13.09 | 0.00 | 2.18 | 15.27 |
| | 30443622 | 31-MAY-10 | DIRECWAY | | 160.00 | 11.20 | 28.58 | 199.78 |
| | 30449674 | 31-MAY-10 | CK133083 | | 20.00 | 0.00 | 3.34 | 23.34 |
| | 41411760 | 31-MAY-10 | Actual-1000A-RO | | 5641.40 | 0.00 | 947.53 | 6588.93 |
| | 41408958 | 31-MAY-10 | Actual-1210A-MA | | 1692.42 | 0.00 | 284.25 | 1976.67 |
| | 41398160 | 31-MAY-10 | 5032A-MSI SOFTW | | 464.88 | 32.54 | 83.06 | 580.48 |
| | 41410532 | 31-MAY-10 | Actual-1800A-RE | | 2595.04 | 0.00 | 435.86 | 3030.90 |

Page 3 of 10

Report Date : 29-JUN-11

ITEMIZED STATEMENT
------------------

Customer No :   06875-80385-09-DAY
Address :       2522 N. DALE MABRY HWY.,TAMPA,FL,33607-2409,US
As of Date:     29-JUN-2011

| Mon-Year | Invoice No | Invoice Date | Description | Accrued | Billing | Amount Tax | FinanceCharges | Total |
|----------|-----------|-------------|-------------|---------|---------|-----------|----------------|-------|
|          |           |             |             | Sub Total | 12069.99 | 43.74 | 2039.03 | 14152.76 |
| JUN-2010 | 30447522 | 04-JUN-10 | OTA Credit | | (8514.02) | 0.00 | 0.00 | (8514.02) |
| | TA0138492 | 20-JUN-10 | T/A COMMISSIONS | | 65.48 | 0.00 | 9.89 | 75.37 |
| | TR0138492 | 20-JUN-10 | TMC / CONSORTIA | | 8.54 | 0.00 | 1.29 | 9.83 |
| | 1138492 | 20-JUN-10 | GDS & INTERNET | | 48.50 | 0.00 | 7.35 | 55.86 |
| | 24002108 | 22-JUN-10 | RES CENTRAL(CAL | | 50.00 | 0.00 | 7.60 | 57.60 |
| | 21139222 | 22-JUN-10 | WYNREWARDS 5% | | 917.91 | 0.00 | 139.08 | 1056.99 |
| | 30458176 | 30-JUN-10 | DIRECWAY | | 160.00 | 11.20 | 25.93 | 197.13 |
| | 41441316 | 30-JUN-10 | Actual-1900A-RE | | 2134.58 | 0.00 | 324.05 | 2458.63 |
| | 41441488 | 30-JUN-10 | Actual-1210A-MA | | 1392.12 | 0.00 | 211.34 | 1603.46 |
| | 41439831 | 30-JUN-10 | Actual-1000A-RO | | 4640.39 | 0.00 | 704.43 | 5344.82 |
| | 41431277 | 30-JUN-10 | 5032A-MSI SOFTW | | 464.88 | 32.64 | 75.25 | 572.77 |
|          |           |             |             | Sub Total | 1368.38 | 43.74 | 1506.31 | 2918.43 |
| JUL-2010 | TA0145220 | 18-JUL-10 | T/A COMMISSIONS | | 11.70 | 0.00 | 1.59 | 13.29 |
| | TR0145220 | 18-JUL-10 | TMC / CONSORTIA | | 2.29 | 0.00 | 0.32 | 2.61 |
| | TV0145220 | 18-JUL-10 | GOVERNMENT FEES | | 2.95 | 0.00 | 0.41 | 3.36 |
| | TM0145220 | 18-JUL-10 | MEMBER BENEFIT | | 15.80 | 0.00 | 2.13 | 17.93 |
| | 1145220 | 18-JUL-10 | GDS & INTERNET | | 31.60 | 0.00 | 4.29 | 35.89 |
| | 21143402 | 22-JUL-10 | WYNREWARDS CRDT | | (95.95) | 0.00 | 0.00 | (95.95) |
| | 21142134 | 22-JUL-10 | WYNREWARDS 5% | | 138.58 | 0.00 | 18.86 | 157.44 |
| | 24002407 | 22-JUL-10 | RES CENTRAL(CAL | | 50.00 | 0.00 | 6.83 | 56.83 |
| | 30468548 | 29-JUL-10 | PM SYSTEM HW WR | | 793.10 | 0.00 | 107.85 | 900.95 |
| | 30468547 | 29-JUL-10 | EQUIP SHIPPING | | 489.89 | 0.00 | 66.61 | 556.50 |
| | 30468544 | 29-JUL-10 | Micros Hardware | | 9813.74 | 686.96 | 1428.09 | 11928.79 |
| | 30468546 | 29-JUL-10 | PM SYSTEM TRAIN | | 14039.15 | 0.00 | 1909.35 | 15948.50 |
| | 41457841 | 31-JUL-10 | 5068A-DIRECWAY | | 160.00 | 11.20 | 23.27 | 194.47 |
| | 41479127 | 31-JUL-10 | Actual-1000A-RO | | 4285.29 | 0.00 | 619.50 | 4904.79 |
| | 41480958 | 31-JUL-10 | Actual-1900A-RE | | 1971.23 | 0.00 | 284.96 | 2256.19 |
| | 41479750 | 31-JUL-10 | Actual-1210A-MA | | 1285.59 | 0.00 | 185.86 | 1471.45 |

Page 4 of 10

Report Date : 29-JUN-11

ITEMIZED STATEMENT
------------------

Customer No :  06875-80385-09-DAY
Address :      2522 N. DALE MABRY HWY.,TAMPA,FL,33607-2409,US
As of Date:    29-JUN-2011

| Mon-Year | Invoice No | Invoice Date | Description | Accrued | Billing | Amount Tax | FinanceCharges | Total |
|----------|-----------|--------------|-------------|---------|---------|-----|---------------|-------|
| | | | | Sub Total | 32994.96 | 698.16 | 4659.92 | 38353.04 |
| AUG-2010 | TA0151562 | 22-AUG-10 | T/A COMMISSIONS | | 17.60 | 0.00 | 2.11 | 19.71 |
| | TG0151562 | 22-AUG-10 | GSA FEES | | 21.36 | 0.00 | 2.58 | 23.94 |
| | 1151562 | 22-AUG-10 | GDS & INTERNET | | 48.75 | 0.00 | 5.91 | 54.66 |
| | 24002491 | 22-AUG-10 | RES CENTRAL(CAL | | 50.00 | 0.00 | 6.07 | 56.07 |
| | TV0151562 | 22-AUG-10 | GOVERNMENT FEES | | 6.16 | 0.00 | 0.76 | 6.92 |
| | 30478034 | 24-AUG-10 | Q/A REINSPECTIO | | 1700.00 | 0.00 | 205.70 | 1905.70 |
| | 41507370 | 31-AUG-10 | Actual-1800A-RE | | 1507.46 | 0.00 | 210.57 | 1718.03 |
| | 41505397 | 31-AUG-10 | Actual-1000A-RO | | 3277.08 | 0.00 | 457.70 | 3734.78 |
| | 41488322 | 31-AUG-10 | 5066A-DIRECWAY | | 160.00 | 11.20 | 20.71 | 191.91 |
| | 41506844 | 31-AUG-10 | Actual-1210A-MA | | 983.12 | 0.00 | 137.33 | 1120.45 |
| | | | | Sub Total | 7771.53 | 11.20 | 1049.44 | 8832.17 |
| SEP-2010 | TA0158669 | 19-SEP-10 | T/A COMMISSIONS | | 7.12 | 0.00 | 0.75 | 7.87 |
| | 1158669 | 19-SEP-10 | GDS & INTERNET | | 29.60 | 0.00 | 3.12 | 32.72 |
| | 24002625 | 22-SEP-10 | RES CENTRAL(CAL | | 50.00 | 0.00 | 5.30 | 55.30 |
| | 41525649 | 30-SEP-10 | 5066A-DIRECWAY | | 160.00 | 11.20 | 18.05 | 189.25 |
| | 41546303 | 30-SEP-10 | Actual-1800A-RE | | 1321.66 | 0.00 | 149.75 | 1471.41 |
| | 41545897 | 30-SEP-10 | Actual-1210A-MA | | 861.95 | 0.00 | 97.66 | 959.61 |
| | 41544318 | 30-SEP-10 | Actual-1000A-RO | | 2873.17 | 0.00 | 329.50 | 3198.67 |
| | | | | Sub Total | 5303.50 | 11.20 | 600.13 | 5914.83 |
| OCT-2010 | TA0165759 | 17-OCT-10 | T/A COMMISSIONS | | 44.07 | 0.00 | 3.98 | 48.05 |
| | TR0165759 | 17-OCT-10 | TMC / CONSORTIA | | 14.10 | 0.00 | 1.28 | 15.38 |
| | 1165759 | 17-OCT-10 | GDS & INTERNET | | 65.55 | 0.00 | 5.94 | 71.49 |
| | 24002898 | 22-OCT-10 | RES CENTRAL(CAL | | 50.00 | 0.00 | 4.54 | 54.54 |
| | 21150256 | 22-OCT-10 | WYNREWARDS 5% | | 56.08 | 0.00 | 5.08 | 61.16 |
| | 41577221 | 31-OCT-10 | Actual-1000A-RO | | 2825.05 | 0.00 | 255.68 | 3080.73 |
| | 30503447 | 31-OCT-10 | HughesNet VSAT | | 160.00 | 11.20 | 15.49 | 186.69 |

Page 5 of 10

Report Date : 29-JUN-11

ITEMIZED STATEMENT
-------------------

Customer No : 06875-80385-09-DAY
Address :    2522 N. DALE MABRY HWY.,TAMPA,FL,33607-2409,US
As of Date:  29-JUN-2011

| Mon-Year | Invoice No | Invoice Date | Description | Accrued | Billing | Amount Tax | FinanceCharges | Total |
|----------|-----------|-------------|-------------|---------|---------|-----------|----------------|-------|
|          | 41578508  | 31-OCT-10   | Actual-1800A-RE |     | 1299.52 | 0.00 | 117.59 | 1417.11 |
|          | 41577801  | 31-OCT-10   | Actual-1210A-MA |     | 847.52  | 0.00 | 76.71  | 924.23  |
|          |           |             | Sub Total   |         | 5361.89 | 11.20 | 486.29 | 5859.38 |
| NOV-2010 | 30507635  | 11-NOV-10   | O/A REINSPECTIO |     | 1700.00 | 0.00 | 153.85 | 1853.85 |
|          | 10511561  | 17-NOV-10   | GUEST SATISFACT |     | 40.32   | 0.00 | 3.00   | 43.32   |
|          | 10511562  | 17-NOV-10   | GUEST SRVCS TRA |     | 160.00  | 0.00 | 12.00  | 172.00  |
|          | TR0171101 | 21-NOV-10   | TMC / CONSORTIA |     | 15.27   | 0.00 | 1.15   | 16.42   |
|          | TA0171101 | 21-NOV-10   | T/A COMMISSIONS |     | 43.62   | 0.00 | 3.27   | 46.89   |
|          | 1171101   | 21-NOV-10   | GDS & INTERNET  |     | 35.20   | 0.00 | 2.65   | 37.85   |
|          | 24003086  | 22-NOV-10   | RES CENTRAL(CAL |     | 50.00   | 0.00 | 3.76   | 53.76   |
|          | 21154873  | 22-NOV-10   | WYNREWARDS 5%   |     | 50.52   | 0.00 | 3.79   | 54.31   |
|          | 41603946  | 30-NOV-10   | Actual-1800A-RE |     | 1016.98 | 0.00 | 76.26  | 1093.24 |
|          | 41597574  | 30-NOV-10   | 5715A-HughesNet |     | 160.00  | 11.20 | 12.84 | 184.04  |
|          | 41603063  | 30-NOV-10   | Actual-1210A-MA |     | 663.25  | 0.00 | 49.75  | 713.00  |
|          | 41605198  | 30-NOV-10   | Actual-1000A-RO |     | 2210.83 | 0.00 | 165.81 | 2376.64 |
|          |           |             | Sub Total   |         | 6145.99 | 11.20 | 488.13 | 6645.32 |
| DEC-2010 | TR0177768 | 20-DEC-10   | TMC / CONSORTIA |     | 5.26    | 0.00 | 0.31   | 5.57    |
|          | TA0177768 | 20-DEC-10   | T/A COMMISSIONS |     | 40.13   | 0.00 | 2.38   | 42.51   |
|          | 1177768   | 20-DEC-10   | GDS & INTERNET  |     | 36.20   | 0.00 | 2.15   | 38.35   |
|          | 10516257  | 22-DEC-10   | GUEST SATISFACT |     | 35.00   | 0.00 | 2.00   | 37.00   |
|          | 10516256  | 22-DEC-10   | GUEST SRVCS TRA |     | 160.00  | 0.00 | 9.52   | 169.52  |
|          | 24003240  | 22-DEC-10   | RES CENTRAL(CAL |     | 50.00   | 0.00 | 2.99   | 52.99   |
|          | 21157624  | 22-DEC-10   | WYNREWARDS 5%   |     | 9.45    | 0.00 | 0.57   | 10.02   |
|          | 30526384  | 31-DEC-10   | VSAT MAR-2010   |     | 160.00  | 11.20 | 11.64 | 182.84  |
|          | 41636008  | 31-DEC-10   | Actual-1210A-MA |     | 863.02  | 0.00 | 51.36  | 914.38  |
|          | 41637777  | 31-DEC-10   | Actual-1800A-RE |     | 1323.29 | 0.00 | 78.73  | 1402.02 |
|          | 41638740  | 31-DEC-10   | Actual-1000A-RO |     | 2876.72 | 0.00 | 171.17 | 3047.89 |
|          | 41627731  | 31-DEC-10   | 5715A-HughesNet |     | 160.00  | 11.20 | 10.18 | 181.38  |

Report Date : 29-JUN-11

ITEMIZED STATEMENT
-----------------

Customer No :  06875-80385-09-DAY
Address :      2522 N. DALE MABRY HWY.,TAMPA,FL,33607-2409,US
As of Date:    29-JUN-2011

| Mon-Year | Invoice No | Invoice Date | Description | Accrued | Billing | Amount Tax | FinanceCharges | Total |
|----------|-----------|--------------|-------------|---------|---------|------------|----------------|-------|
| | | | | Sub Total | 5719.07 | 22.40 | 343.08 | 6084.55 |
| JAN-2011 | 1184686 | 16-JAN-11 | GDS & INTERNET | | 52.60 | 0.00 | 3.17 | 55.77 |
| | TR0194686 | 16-JAN-11 | TMC / CONSORTIA | | 4.98 | 0.00 | 0.30 | 5.28 |
| | 24003473 | 22-JAN-11 | RES CENTRAL/CAL | | 50.00 | 0.00 | 2.86 | 52.86 |
| | 21159545 | 22-JAN-11 | WYNREWARDS 5% | | 64.28 | 0.00 | 3.67 | 67.95 |
| | 41676097 | 31-JAN-11 | Accrual-1800A-R | * | 1597.95 | 0.00 | 83.90 | 1681.85 |
| | 41680117 | 31-JAN-11 | Accrual-1210A-M | * | 1042.14 | 0.00 | 54.70 | 1096.84 |
| | 41678466 | 31-JAN-11 | Accrual-1000A-R | * | 3473.80 | 0.00 | 182.37 | 3656.17 |
| | 41653483 | 31-JAN-11 | 5715A-HughesNet | | 160.00 | 11.20 | 8.98 | 180.18 |
| | | | | Sub Total | 6445.75 | 11.20 | 339.95 | 6796.90 |
| FEB-2011 | 30534684 | 04-FEB-11 | Q/A REINSPECTIO | | 1700.00 | 0.00 | 85.85 | 1785.85 |
| | 30540816 | 14-FEB-11 | SUMMIT 2011 FEE | | 599.00 | 0.00 | 27.26 | 626.26 |
| | TR0190906 | 20-FEB-11 | TMC / CONSORTIA | | 13.00 | 0.00 | 0.56 | 13.56 |
| | 1190906 | 20-FEB-11 | GDS & INTERNET | | 72.40 | 0.00 | 3.08 | 75.48 |
| | TA0190906 | 20-FEB-11 | T/A COMMISSIONS | | 118.36 | 0.00 | 5.03 | 123.39 |
| | 24003650 | 22-FEB-11 | RES CENTRAL/CAL | | 50.00 | 0.00 | 2.08 | 52.08 |
| | 21361578 | 22-FEB-11 | WYNREWARDS 5% | | 55.83 | 0.00 | 2.32 | 58.15 |
| | 41703701 | 28-FEB-11 | Accrual-1800A-R | * | 2478.78 | 0.00 | 95.43 | 2574.21 |
| | 41702646 | 28-FEB-11 | Accrual-1000A-R | * | 5388.65 | 0.00 | 207.46 | 5596.11 |
| | 41702241 | 28-FEB-11 | Accrual-1210A-M | * | 1616.60 | 0.00 | 62.24 | 1678.84 |
| | 41689764 | 28-FEB-11 | 5715A-HughesNet | | 160.00 | 11.20 | 6.59 | 177.79 |
| | | | | Sub Total | 12292.62 | 11.20 | 497.90 | 12761.72 |
| MAR-2011 | 10527517 | 09-MAR-11 | GUEST SATISFACT | | 75.00 | 0.00 | 2.55 | 77.55 |
| | 10527518 | 09-MAR-11 | GUEST SRVCS TRA | | 160.00 | 0.00 | 5.44 | 165.44 |
| | TA0198690 | 13-MAR-11 | T/A COMMISSIONS | | 110.67 | 0.00 | 3.38 | 114.05 |
| | TR0198690 | 13-MAR-11 | TMC / CONSORTIA | | 15.98 | 0.00 | 0.49 | 16.47 |
| | TV0198690 | 13-MAR-11 | GOVERNMENT FEES | | 11.75 | 0.00 | 0.36 | 12.11 |

Page 7 of 10

Report Date : 29-JUN-11

ITEMIZED STATEMENT
-------------------

Customer No : 06875-80385-09-DAY
Address :    2522 N. DALE MABRY HWY., TAMPA, FL, 33607-2409, US
As of Date:  29-JUN-2011

| Mon-Year | Invoice No | Invoice Date | Description | Accrued | Billing | Amount Tax | FinanceCharges | Total |
|----------|-----------|--------------|-------------|---------|---------|------------|----------------|-------|
|  | 1198690 | 13-MAR-11 | GDS & INTERNET | | 131.00 | 0.00 | 4.00 | 135.00 |
|  | 10529283 | 17-MAR-11 | GUEST SATISFACT | | 99.68 | 0.00 | 3.00 | 102.68 |
|  | 10529229 | 17-MAR-11 | GUEST SRVCS TRA | | 160.00 | 0.00 | 4.90 | 164.80 |
|  | 10530756 | 17-MAR-11 | GUEST SATISFACT | | (75.00) | 0.00 | 0.00 | (75.00) |
|  | 21165515 | 22-MAR-11 | WYNREWARDS 5% | | 30.09 | 0.00 | 0.93 | 30.92 |
|  | 24003702 | 22-MAR-11 | RES CENTRAL(CAL | | 50.00 | 0.00 | 1.38 | 51.38 |
|  | 10530512 | 24-MAR-11 | GUEST SATISFACT | | 30.00 | 0.00 | 0.80 | 30.80 |
|  | 10530513 | 24-MAR-11 | GUEST SRVCS TRA | | 160.00 | 0.00 | 4.24 | 164.24 |
|  | 10531262 | 31-MAR-11 | GUEST SRVCS TRA | | 160.00 | 0.00 | 3.68 | 163.68 |
|  | 10531451 | 31-MAR-11 | GUEST SATISFACT | | 30.00 | 0.00 | 0.70 | 30.70 |
|  | 10531530 | 31-MAR-11 | GUEST SRVCS TRA | | 160.00 | 0.00 | 3.68 | 163.68 |
|  | 41734655 | 31-MAR-11 | Accrual-1210A-M | * | 2883.20 | 0.00 | 66.31 | 2949.51 |
|  | 10531261 | 31-MAR-11 | GUEST SATISFACT | | 61.59 | 0.00 | 1.41 | 63.00 |
|  | 10531362 | 31-MAR-11 | GUEST SRVCS TRA | | 160.00 | 0.00 | 3.68 | 163.68 |
|  | 10531361 | 31-MAR-11 | GUEST SATISFACT | | 35.00 | 0.00 | 0.80 | 35.80 |
|  | 30559839 | 31-MAR-11 | PRM SUPPORT | | 93.71 | 0.00 | 2.15 | 95.86 |
|  | 41737860 | 31-MAR-11 | Accrual-1800A-R | * | 4420.90 | 0.00 | 101.68 | 4522.58 |
|  | 41723175 | 31-MAR-11 | 5715A-HughesNet | | 160.00 | 11.20 | 3.93 | 175.13 |
|  | 30558962 | 31-MAR-11 | PM SYSTEM TRAIN | | 1273.40 | 0.00 | 29.29 | 1302.69 |
|  | 30558961 | 31-MAR-11 | EQUIP SHIPPING | | 750.00 | 0.00 | 17.26 | 767.26 |
|  | 30558963 | 31-MAR-11 | PM SYSTEM SOFTW | | 1986.53 | 139.06 | 48.89 | 2174.48 |
|  | 41735791 | 31-MAR-11 | Accrual-1000A-R | * | 9610.65 | 0.00 | 221.05 | 9831.70 |

Sub Total   22744.15   150.26   535.78   23430.19

| APR-2011 | 10532748 | 07-APR-11 | GUEST SRVCS TRA | | 160.00 | 0.00 | 3.12 | 163.12 |
|  | 10533965 | 07-APR-11 | GUEST SATISFACT | | 40.00 | 0.00 | 0.78 | 40.78 |
|  | 24003932 | 22-APR-11 | RES CENTRAL(CAL | | 50.00 | 0.00 | 0.60 | 50.60 |
|  | 21167861 | 22-APR-11 | WYNREWARDS 5% | | 82.86 | 0.00 | 0.99 | 83.85 |
|  | TRO204046 | 27-APR-11 | TMC / CONSORTIA | | 32.86 | 0.00 | 0.31 | 33.17 |
|  | TAO204046 | 27-APR-11 | T/A COMMISSIONS | | 166.42 | 0.00 | 1.58 | 168.00 |
|  | 1204046 | 27-APR-11 | GDS & INTERNET | | 240.80 | 0.00 | 2.29 | 243.09 |
|  | 41766161 | 30-APR-11 | Accrual-1000A-R | * | 6431.55 | 0.00 | 51.45 | 6483.00 |
|  | 41752517 | 30-APR-11 | 5715A-HughesNet | | 160.00 | 11.20 | 1.37 | 172.57 |
|  | 30571128 | 30-APR-11 | PRM SUPPORT | | 93.71 | 0.00 | 0.75 | 94.46 |
|  | 41768818 | 30-APR-11 | Accrual-1800A-R | * | 2958.51 | 0.00 | 23.67 | 2982.18 |
|  | 41768749 | 30-APR-11 | Accrual-1210A-M | * | 1929.47 | 0.00 | 15.44 | 1944.91 |

Page 8 of 10

Case 2:14-cv-00537-JLL-JAD   Document 1   Filed 01/27/14   Page 93 of 97 PageID: 93

Report Date : 29-JUN-11

ITEMIZED STATEMENT
------------------

Customer No : 06875-80385-09-DAY
Address :   2572 N. DALE MABRY HWY., TAMPA, FL, 33607-2409, US
As of Date:   29-JUN-2011

| Mon-Year | Invoice No | Invoice Date | Description | Accrued | Billing | Amount Tax | FinanceCharges | Total |
|----------|-----------|--------------|-------------|---------|---------|------------|----------------|-------|
| | | | | Sub Total | 12346.18 | 11.20 | 102.35 | 12459.73 |
| MAY-2011 | 30575084 | 09-MAY-11 | 2010 CONF CREDI | | (21.00) | 0.00 | 0.00 | (21.00) |
| | 21170207 | 22-MAY-11 | WYNREWARDS 5% | | 112.50 | 0.00 | 0.00 | 112.50 |
| | 24004151 | 22-MAY-11 | RES CENTRAL(CAL | | 50.00 | 0.00 | 0.00 | 50.00 |
| | 1210771 | 27-MAY-11 | GDS & INTERNET | | 51.00 | 0.00 | 0.00 | 51.00 |
| | TA0210771 | 27-MAY-11 | T/A COMMISSIONS | | 36.46 | 0.00 | 0.00 | 36.46 |
| | 41789606 | 31-MAY-11 | 5235A-HughesNet | | 160.00 | 11.20 | 0.00 | 171.20 |
| | 41798668 | 31-MAY-11 | Accrual-1210A-M | * | 1794.45 | 0.00 | 0.00 | 1794.45 |
| | 41801196 | 31-MAY-11 | Accrual-1000A-R | * | 5981.50 | 0.00 | 0.00 | 5981.50 |
| | 41798573 | 31-MAY-11 | Accrual-1800A-R | * | 2751.49 | 0.00 | 0.00 | 2751.49 |
| | 41789307 | 31-MAY-11 | 5625A-PRM SUPPO | | 93.71 | 0.00 | 0.00 | 93.71 |
| | | | | Sub Total | 11010.11 | 11.20 | 0.00 | 11021.31 |
| JUN-2011 | 10547374 | 16-JUN-11 | GUEST SATISFACT | | 73.83 | 0.00 | 0.00 | 73.83 |
| | 10547372 | 16-JUN-11 | GUEST SRVCS TRA | | 160.00 | 0.00 | 0.00 | 160.00 |
| | 21173698 | 22-JUN-11 | WYNREWARDS 5% | | 110.75 | 0.00 | 0.00 | 110.75 |
| | 24004329 | 22-JUN-11 | RES CENTRAL(CAL | | 50.00 | 0.00 | 0.00 | 50.00 |
| | 1217550 | 27-JUN-11 | GDS & INTERNET | | 24.00 | 0.00 | 0.00 | 24.00 |
| | | | | Sub Total | 418.58 | 0.00 | 0.00 | 418.58 |
| | | | | Grand Total | 187657.38 | 1171.98 | 20400.81 | 209230.17 |

Requested By: Kanyelle Barrino

Page 9 of 10

Case 2:14-cv-00537-JLL-JAD   Document 1   Filed 01/27/14   Page 94 of 97 PageID: 94

Report Date : 29-JUN-11

ITEMIZED STATEMENT
---------------------

* Please note the accruals on your account are estimates.
  Make sure to promptly submit your actual gross room revenue and rooms sold.


******* END OF REPORT *******


Page 10 of 10

## DE-IDENTIFICATION PROCEDURES

You must complete each of the following within 10 days after the Termination Date:

1.  Remove, replace or cover with an opaque cover the primary Facility signage.

2.  Remove all interior signage that contains Days Marks.

3.  Change advertising billboards to remove Days Marks.

4.  Stop answering Facility telephone as Days guest lodging facility.

5.  Remove Days name and Marks from any domain name, advertising and brochures.

6.  Return to us all confidential operations and training manuals.

7.  Remove the Days name and Marks from the following items:

| | |
|---|---|
| Stationery, pads and pens | Soap/shampoo |
| Directories and brochures | Key tags |
| Business cards | Credit card imprinter |
| Folios and registration cards | Laundry bags |
| Do-not-disturb cards | Name tags/uniforms |
| Comment cards | Ice buckets/trays |
| Telephone plates | Ashtrays/matches |
| Telephone dialing instructions | Plaques |
| TV channel ID plates | Guest checks/receipts |
| Rate/law cards | Menus |
| Door signage | |

8.  Paint over or remove any distinctive Days trade dress, paint schemes or architectural features.

9.  It is prohibited to re-name the Facility with a confusingly similar name or color scheme as a Days facility.

10. Our quality assurance inspectors will visit the Facility at any time after 10 days after the Termination Date to verify that you have performed these de-identification obligations.

UPS CampusShip: Shipment Receipt

Page 1 of 1

## Shipment Receipt

Transaction Date:
Tracking Number:

29 Jun 2011
1Z208E3702936608295

**1** Address Information

| Ship To: | Ship From: | Return Address: |
|---|---|---|
| Naidip Hospitality-I, LLC | Wyndham Worldwide - 22 Sylvan | Wyndham Worldwide - 22 Sylvan |
| Jayesh Patel | Kanyelle Barrino | Kanyelle Barrino |
| 2055 North Dale Mabry Hwy | 22 Sylvan Way | 22 Sylvan Way |
| TAMPA FL 336072542 | Parsippany NJ 07054 | Parsippany NJ 07054 |
| Telephone:19413559721 | Telephone 973-753-7787 | Telephone:973-753-7787 |

**2** Package Information

| Weight | Dimensions / Packaging | Declared Value | Reference Numbers |
|---|---|---|---|
| 1 Letter | UPS Letter | | Reference # 1 - 006-5072 |

**3** UPS Shipping Service and Shipping Options

Service:
UPS 2nd Day Air

Guaranteed By: 1
End of Day Friday, 7/01/2011

Shipping Fees Subtotal:                 14.67 USD

Transportation                          12.65 USD
Fuel Surcharge                           2.02 USD

**4** Payment Information

Bill Shipping Charges to:               Shipper's Account 208E37

Daily rates were applied to this shipment
Total Charged:                                                    14.67 USD

Note: Your invoice may vary from the displayed reference rates.

* For delivery and guarantee information, see the UPS Service Guide. To speak to a customer service representative, call 1-800-PICK-UPS for domestic services and 1-800-782-7892 for international services.

Close Window

UPS CampusShip: Shipment Receipt

## Shipment Receipt

| | |
|---|---|
| Transaction Date: | 29 Jun 2011 |
| Tracking Number: | 1Z208E370294730301 |

### 1 Address Information

| Ship To: | Ship From: | Return Address: |
|---|---|---|
| Colonial Bank | Wyndham Worldwide - 22 Sylvan | Wyndham Worldwide - 22 Sylvan |
| 400 North Tampa St. | Kanyelle Barrino | Kanyelle Barrino |
| TAMPA FL 336024719 | 22 Sylvan Way | 22 Sylvan Way |
| | Parsippany NJ 07054 | Parsippany NJ 07054 |
| | Telephone 973-753-7787 | Telephone 973-753-7787 |

### 2 Package Information

| | Weight | Dimensions / Packaging | Declared Value | Reference Numbers |
|---|---|---|---|---|
| 1 | Letter | UPS Letter | | Reference # 1 - 006-5072 |

### 3 UPS Shipping Service and Shipping Options

Service:
UPS 2nd Day Air
Guaranteed By: 1
End of Day Friday, 7/01/2011

| Shipping Fees Subtotal: | 14.67 USD |
|---|---|
| Transportation | 12.65 USD |
| Fuel Surcharge | 2.02 USD |

### 4 Payment Information

| Bill Shipping Charges to: | Shipper's Account 208E37 |
|---|---|

| Daily rates were applied to this shipment | |
|---|---|
| Total Charged: | 14.67 USD |

Note: Your invoice may vary from the displayed reference rates.

* For delivery and guarantee information, see the UPS Service Guide. To speak to a customer service representative, call 1-800-PICK-UPS for domestic services and 1-800-782-7892 for international services

Close Window